STATE STREET TRUST COMPANY, Appellant, *v.* ALWIN C. ERNST et al., Copartners, under the Firm Name of ERNST & ERNST, Respondents.

Argued January 26, 1938; decided May 24, 1938.

*William F. Bleakley, Frank A. Fritz, Arthur C. Patterson* and *Winthrop G. Brown* for appellant. The trial court, having denied defendants' motions to dismiss the complaint and having found that there was evidence to go to the jury, should not have directed a verdict for defendants. (*Bergman* v. *Scottish Union & National Ins. Co.,* 264 N. Y. 205; *Bank of United States* v. *Manheim,* 264 N. Y. 45; 264 N. Y. 511; *Bagley* v. *Bowe,* 105 N. Y. 171; *McDonald* v. *Metropolitan St. Ry. Co.,* 167 N. Y. 66; *Matter of Case,* 214 N. Y. 199; *Getty* v. *Williams Silver Co.,* 221 N. Y. 34; *Schmulewitz* v. *Cohen,* 243 App. Div. 744; *Ultramares Corporation* v. *Touche,* 255 N. Y. 170; *O'Connor* v. *Ludlam,* 92 Fed. Rep. [2d] 50.) There was ample credible evidence to go to the jury. (*Smith* v. *Brooklyn Savings Bank,* 101 N. Y. 58; *President of D. & H. Canal Co.* v. *Pennsylvania Coal Co.,* 50 N. Y. 250; *Matter of London General Bank,* [1895] 2 Ch. 673; *Mullen* v. *Quinlan & Co.,* 195 N. Y. 109; *Matter of Kingston Cotton Mills,* [1896] 2 Ch. 279; *Ochs* v. *Woods,* 221 N. Y. 335; *Laska* v. *Harris,* 215 N. Y. 554; *Ehrgott* v. *Mayor,* 96 N. Y. 264; *Voak* v. *Northern Central Ry. Co.,* 75 N. Y. 320; *Twomley* v. *Central Park, N. & E. R. R. Co.,* 69 N. Y. 158; *Wagner* v. *International Ry. Co.,* 232 N. Y. 176; *Norske Ameriekalinje Actiesselskabet* v. *Sun Printing & Pub. Assn.,* 226 N. Y. 1; *Berquist* v. *Kriedler,* 158 Minn. 127.)

*Frederick J. Moses, Thomas E. Wing, Burt D. Whedon* and *Clan Crawford* for respondents. The denial of defendants' motion to dismiss did not preclude the court

from directing a verdict for the defendants. (*Bail* v. *N. Y., N. H. & H. R. R. Co.*, 201 N. Y. 355; *Matter of Case*, 214 N. Y. 199.) There were no misrepresentations in defendants' balance sheet. (*Matter of London & General Bank*, L. R. [1895] 2 Ch. 673; *Kountze* v. *Kennedy*, 147 N. Y. 124.) Defendants made no misrepresentation as to accounts receivable. (*Reno* v. *Bull*, 226 N. Y. 546; *Bernheimer* v. *Rindskopf*, 116 N. Y. 428.) The " allowance for discounts " was not inadequate and there is no evidence that it was inadequate. (*Lamb* v. *Union Ry. Co.*, 195 N. Y. 260; *Ruppert* v. *Brooklyn Heights Ry.*, 154 N. Y. 90.) The criticism of the allowance for doubtful accounts is not justified. (*Roberts* v. *N. Y. E. R. R. Co.*, 128 N. Y. 455.) The Ernst balance sheet did not prove the Greenstein balance sheet to be substantially correct and the trust company did not rely on that balance sheet in making any one of the time loans. (*Bank of United States* v. *Manheim*, 264 N. Y. 45.) There was no evidence of damage. ( *Urtz* v. *N. Y. C. & H. R. R. R. Co.*, 202 N. Y. 170; *Ochs* v. *Woods*, 221 N. Y. 335; *Reno* v. *Bull*, 226 N. Y. 546; *Wemple* v. *Hildreth*, 10 Daly 481; 94 N. Y. 644; *N. Y. Land Improvement Co.* v. *Chapman*, 118 N. Y. 288; *Martin* v. *Clark*, 19 App. Div. 496; *Graham* v. *Peale*, 173 Fed. Rep. 9.) The trust company's negligence in discounting new notes was a succeeding and independent cause of its loss and not concurrent with the alleged fraud. (*Deyo* v. *Hudson*, 225 N. Y. 602.)

FINCH, J. Was the evidence introduced by plaintiff so inadequate that, resolving all contested issues and drawing all possible inferences in plaintiff's favor, a jury could not find that defendants were guilty of gross negligence raising an inference of fraud, and that plaintiff relied upon the certified balance sheet prepared by defendants, thereby suffering damage?

The Pelz-Greenstein Company was organized in 1922 to engage in the business of financing wholesalers or mills.

Its sole business was lending money, taking back, as collateral, inventory of the borrower and assignments of accounts receivable. Each borrower was referred to as a "department." Advances were made by Pelz-Greenstein to its borrowers to enable them to purchase or manufacture merchandise. Pelz-Greenstein was repaid in large part by the assignment of accounts receivable resulting from the sales of such merchandise. The collectibility of these advances thus depended in the first instance on the salability of the merchandise manufactured or purchased by the funds so advanced. If the merchandise failed to sell, not only was the repayment of the advances jeopardized, but likewise the income of Pelz-Greenstein, for its major item of income, to wit, commissions, was a percentage of the assigned accounts.

On January 19, 1929, the president of Pelz-Greenstein applied to plaintiff for a line of credit and a loan of $300,000. He presented an estimated balance sheet of the business as of December 31, 1928, and stated that defendants, a firm of accountants, were making an audit of the condition of the company as of that date and that a balance sheet certified by defendants would be submitted to plaintiff when it had been prepared. Plaintiff refused to grant the application of Pelz-Greenstein for a time loan until it had received the certified balance sheet of defendants and had found that it substantially corroborated the estimated balance sheet. Pending the receipt of the certified balance sheet of defendants plaintiff made a demand loan to Pelz-Greenstein of $300,000.

This certified balance sheet prepared by defendants was dated April 2, 1929, and issued in ten counterparts. The defendants admit that they knew it was to be used to obtain credit. On April 9 a copy was given by Pelz-Greenstein to plaintiff. Plaintiff found that the certified balance sheet substantially corroborated the estimated balance sheet. The demand note was then surrendered and a three months' time note taken in its place. This

note was renewed for three months' periods, the last renewal being made January 9, 1930. Morgan, the lending officer of plaintiff, testifies that he relied upon this certified balance sheet in passing upon the application for the loan and in making the renewals. On April 26, 1930, Pelz-Greenstein was petitioned into bankruptcy. Plaintiff has received back only a portion of its loan and brings this action for the difference.

With the certified balance sheet defendants issued the following certificate:

" We hereby certify that we examined the books of account and record pertaining to the assets and liabilities of Pelz-Greenstein Co., Inc., New York City, as of the close of business December 31, 1928, and, based on the records examined, information submitted to us, and subject to the foregoing notes [not here material], it is our opinion that the above condensed statement shows the financial condition of the company at the date stated and that the related income and surplus account is correct."

On May 9, 1929, a month after supplying ten copies of the balance sheet to be used, to the knowledge of the defendants, to obtain credit, defendants sent a letter to the Pelz-Greenstein Company containing comments on and explanations of the balance sheet. Apparently only one copy of this letter was sent, and it did not come to the attention of plaintiff nor, so far as the evidence shows, to any one else until after the bankruptcy of Pelz-Greenstein. This accompanying letter contained statements of facts discovered by defendants in the course of their audit, and, therefore, known to them when they prepared the original certified balance sheet, but which were not mentioned therein. One of the defendants testified before trial that the certified balance sheet was subject to the comments contained in the letter and the letter was sent for the purpose of trying to prevent any one from using this balance sheet without knowing the scope of the examination which was made.

At the close of plaintiff's case defendants moved to dismiss the complaint. The trial judge reserved decision. Defendants thereupon rested without calling any witnesses, although there would naturally be available the men who made the audit, those who prepared or supervised the preparation of the working papers or the certified balance sheet and experts to refute the testimony offered by the experts called by plaintiff. Defendants renewed their motion to dismiss and also moved for a directed verdict. The court reserved decision and submitted the case to the jury. After the jury rendered a verdict for plaintiff the trial judge denied the reserved motion to dismiss, but granted a motion to set aside the verdict, and directed a verdict for defendants. The Appellate Division has unanimously affirmed, and the appeal is here by permission of this court.

In the brief of respondents, Pelz and Greenstein are denominated as deliberately dishonest. It is there conceded that they made old and probably uncollectible accounts appear good by causing payments to be made to Pelz-Greenstein, Inc., by another corporation owned by themselves, which payments, credited to such old accounts, made it appear as if the debtors had been paying their debts. They induced one Saqui, who freely admitted his own dishonesty and testified on behalf of plaintiff, to furnish false inventories and to assign to Pelz-Greenstein large numbers of false and fictitious accounts. In one account of $800,000 there were $300,000 of wholly fictitious sales. At the time Pelz-Greenstein was hopelessly insolvent.

To what extent may accountants be held liable for their failure to reveal this condition? We have held that in the absence of a contractual relationship or its equivalent, accountants cannot be held liable for ordinary negligence in preparing a certified balance sheet even though they are aware that the balance sheet will be used to obtain credit. ( *Ultramares Corp.* v. *Touche*, 255 N. Y.

170.) Accountants, however, may be liable to third parties, even where there is lacking deliberate or active fraud. A representation certified as true to the knowledge of the accountants when knowledge there is none, a reckless misstatement, or an opinion based on grounds so flimsy as to lead to the conclusion that there was no genuine belief in its truth, are all sufficient upon which to base liability. A refusal to see the obvious, a failure to investigate the doubtful, if sufficiently gross, may furnish evidence leading to an inference of fraud so as to impose liability for losses suffered by those who rely on the balance sheet. In other words, heedlessness and reckless disregard of consequence may take the place of deliberate intention.

In *Ultramares Corp.* v. *Touche* (255 N. Y. 170) we said with no uncertainty that negligence, if gross, or blindness, even though not equivalent to fraud, was sufficient to sustain an inference of fraud. Our exact words were: " In this connection we are to bear in mind the principle already stated in the course of this opinion that negligence or blindness, even when not equivalent to fraud, is none the less evidence to sustain an inference of fraud. At least this is so if the negligence is gross " (p. 190).

To emphasize our holding that active and deliberate fraud was not necessary to create liability, and that gross negligence, and even blindness to the obvious may be evidence to sustain an inference of fraud, we were careful to point out that the language in *Kountze* v. *Kennedy* (147 N. Y. 124), saying that misjudgment, however gross, or want of caution, however marked, is not fraud, must be confined to the facts of that case, where the trier of the facts had found the defendants guiltless, and the ruling " amounted merely to a holding that a finding of fraud did not follow as an inference of law." (*Ultramares Corp.* v. *Touche, supra,* p. 191.)

The defendants, however, contend that they may escape all liability by insisting that the balance sheet merely

purported to reflect the condition of the books and that it did this correctly. The balance sheet, however, did not correctly reflect the condition of the company even as shown by the books, as will later appear. Nor is the duty of an accountant in preparing a balance sheet confined to a mere setting up of the items from the books. Such duties have been defined.

" His [the auditor's] business is to ascertain and state the true financial position of the company at the time of the audit, and his duty is confined to that. But then comes the question, ' How is he to ascertain that position?' The answer is, ' By examining the books of the company.' But he does not discharge his duty by doing this without inquiry and without taking any trouble to see that the books themselves shew the company's true position. He must take reasonable care to ascertain that they do so. Unless he does this his audit would be worse than an idle farce. Assuming the books to be so kept as to shew the true position of a company, the auditor has to frame a balance-sheet shewing that position according to the books and to certify that the balance sheet presented is correct in that sense. But his first duty is to examine the books, not merely for the purpose of ascertaining what they do shew, but also for the purpose of satisfying himself that they shew the true financial position of the company." (*Matter of London & General Bank*, [1895] 2 Ch. 673, 682.)

The record is, indeed, replete with evidence, both oral and documentary, to make a *prima facie* case against the defendants. In the first place, we have these accountants guilty of an act which is the equivalent of active misrepresentation. On April 2, 1929, they sent to Pelz-Greenstein the certified balance sheet, with ten additional copies, knowing that it was to be used to obtain credit. " Nothing was said as to the persons to whom these counterparts would be shown or the extent or number of

the transactions in which they would be used * * * The range of the transactions in which a certificate of audit might be expected to play a part was as indefinite and wide as the possibilities of the business that was mirrored in the summary." ( *Ultramares Corp.* v. *Touche*, 255 N. Y. 170, 174.) Not until thirty days later did the accountants send to Pelz-Greenstein a letter of explanation of this balance sheet, and then apparently only one copy. So important was this covering letter in the minds of defendants that, although the balance sheet attached to the covering letter was in other respects substantially identical with the original balance sheet, it contained the following notation, which did not appear at all on the original balance sheet released thirty days earlier: " This balance sheet is subject to the comments contained in the letter attached to and made a part of this report." One of the copartners, testifying before trial, said: " We want to try to prevent anyone using this balance sheet, without knowing the scope of the examination which we made, which is set forth in paragraph 2 of the full report. * * * We have had cases where our entire covering letter had been deleted from these reports and just the balance sheet used." Yet, in effect, these defendants themselves did just this. They held back this covering letter for thirty days and issued the balance sheet alone to the world of possible lenders. The loan by the plaintiff was made long before this important covering letter was even sent.

The above act of the accountants, in placing in circulation a certified balance sheet which they practically conceded should not be used without knowing the scope of the examination set forth in the covering letter, and then allowing a period of thirty days to elapse before sending the covering letter, and then only one copy, whereas there had been ten copies of the certified balance sheet issued, was itself gross negligence and an important piece of evidence raising an inference of fraud.

The certified balance sheet, outside of capital, showed a small surplus of $83,000. According to the evidence and the reasonable inferences deductible therefrom, a jury might have found that instead of a surplus of $83,000 the balance sheet should have shown a deficit and impairment of capital of over half a million. A jury could also have found that in addition over $768,000 of its commission accounts were in a condition indicating the likelihood of substantial losses.

Turning now to the specific items. The second largest item in the balance sheet was the item:

" Commission Accounts Receivable — secured by merchandise

Advances...........................$2,043,337 81
Less allowance......................$ 19,767 15

2,023,570 66 "

The above item represented the advances made by Pelz-Greenstein to its borrowers to finance their operations in the purchase or manufacture of merchandise. These accounts, amounting to over one-fourth of Pelz-Greenstein's total assets, were shown on the certified balance sheet as good after deducting the $19,000 allowance. Yet, to the knowledge of defendants, according to their own statement, in the delayed covering letter, a very large proportion of these commission accounts receivable " were comparatively inactive during the year and appeared slow of collection." Out of the total of $2,043,000 an aggregate of $768,000, or over 38 per cent of the total amount, had unpaid advances at the end of the year 1928, amounting to 125 per cent of the total sales during the year. This meant that these borrowers owed Pelz-Greenstein more money at the end of the year than their total sales during the year by 25 per cent, thus indicating stagnation of inventories. Not only did these stagnant accounts represent over 38 per cent in amount,

but they included 27 out of 55 borrowers. The defendants had knowledge of this condition as shown by the delayed covering letter, and this knowledge was brought home to them by their report for the prior year, when they referred in the following manner to similar accounts, although the percentage of advances to sales then was only 65 per cent, as compared with 125 per cent in 1928: " The following accounts had excessive advances as measured by their sales volume which indicated probably excessive or slow moving inventories." It was conceded that this was the third consecutive audit by the defendants of the books of Pelz-Greenstein.

One of the experts for the plaintiff testified without contradiction that the percentage of unpaid advances, amounting to 125 per cent of sales, indicated that the accounts were in an over-extended condition and were badly out of proportion to the amount of merchandise sold during the year, indicating that the inventories were either excessive, slow moving or unsalable. In his opinion this condition indicated the likelihood of excessive losses. Furthermore, this expert testified unequivocally that the financial condition of Pelz-Greenstein could not be truthfully expressed without mention of this condition in the balance sheet. Professor Cole, the other expert called by plaintiff, testified that proper accounting practice required that defendants either establish a very large allowance for uncollectible accounts or indicate, in connection with the balance sheet, the existence of approximately $768,000 with a ratio of advances to sales of 125 per cent. The best corroboration of the testimony of both these experts is what defendants themselves said of this condition in the delayed covering letter. In spite of this a reserve of a mere $19,767.15 was set up against this account. This was to cover not only those accounts of $768,000, showing the stagnation of inventories described above, but all other commission accounts in a total of over $2,000,000.

This small reserve of $19,000 was practically absorbed in the one account of W. K. Wardener, which had gone into bankruptcy in 1924 and from which account Pelz-Greenstein had received nothing since May, 1924. Even if the accountants had not been informed that the Wardener account was in bankruptcy yet a warning that this account required a substantial reserve was given to them by the fact that an account upon which nothing had been received since May, 1924, was being padded year after year by monthly interest charges. From a failure to note on the balance sheet the stagnant condition of over three-quarters of a million of these accounts and the setting up of a totally inadequate reserve, a jury might reasonably draw the inference that these defendants had no genuine belief in these figures in the balance sheet to which they certified.

We next come to a very substantial item entitled

" Commission Account Advances — Inactive and in Liquidation . . . . . . . . . . . . . . . . . . . . . . . . . . $215,124 72."

This item appeared on the certified balance sheet without any reserve. The books of Pelz-Greenstein showed on their face that many of the accounts included in this item had had no transactions for many years, neither sales nor realizations upon security. Furthermore, within this time the books showed systematic inflation of these accounts by steadily increasing interest charges. In fact, these charges were added to one account, even though the account appeared on the face of the books to have been in bankruptcy. The covering letter set forth the real condition of these accounts in detail, thus showing full knowledge on the part of the defendants. Defendants seek to sustain the integrity of this item on the ground that they placed it " below the line " and characterized it as " inactive and in liquidation." The only evidence in the record concerning the effect of these acts is the uncontradicted evidence of the accounting experts that placing an item below the line means only that it is not

current but that otherwise it will be realizable in full. Furthermore, these expert witnesses testified that the failure to set up a reserve against an item, whether it is placed above or below the line, according to the rules of accountancy which any one must apply in reading a balance sheet, means that the accountants represent that they have no knowledge which would indicate to them that these accounts are worth less than " full value " and " that the people certifying to this balance sheet indicate this is the value." The experts went on to testify without contradiction that from the facts as shown on the face of the books a reserve of at least $150,000 should have been set up against these accounts unless investigation showed them to be of full value.

The defendants urge that these defendants were excused from investigation because of a letter from Leon S. Pelz, treasurer of Pelz-Greenstein, in which he stated that Pelz-Greenstein had in its possession " sufficient salable merchandise to completely liquidate " these accounts. In other words, defendants were content to certify a balance sheet knowing it would be used to secure bank credit which contained an item of over $125,000 of apparently dead accounts on the uninvestigated and unsupported statement of the party seeking the credit that these accounts were amply secured, although it appeared on the face of the books that there had been no realization upon this security for years. Where the books indicate the likelihood of a substantial loss, a failure to indicate this on the balance sheet can be justified only by an actual check-up. It does not suffice to rely instead upon the statement of an officer of the firm the books of which are being examined. If an accountant may disregard a situation which indicates substantial losses because he is informed by the person whose books are being examined that there is adequate security, the balance sheet issued by the accountant, by its failure to point this out, contains a misrepresentation. The very purpose of the bank in seeking the balance sheet

prepared by the accountant is to check any possible fraud on the part of the person seeking the loan. Yet these accountants contend that they may accept as true a statement by the party whose books are being examined, make no check-up or investigation on their own part, and issue a statement omitting entirely any mention of the reason why investigation of the security was omitted.

We have explicit expert testimony, uncontradicted, that under these circumstances it was improper accounting practice for defendants to accept a letter from Pelz-Greenstein, and that they should have investigated these accounts very fully to ascertain whether the companies were still in business and to ascertain definitely and independently what security, if any, Pelz-Greenstein held for the payment of these accounts.

We next come to an item which is not as large as those which have gone before, but as to which there was obvious gross negligence. In the " Accounts Receivable " item of $3,200,000, protected only by a reserve of $15,000, was a group of accounts totaling over $72,000 denominated by defendants on their work sheet as " Ocean Bankrupt Accounts." Defendants stated that the failure to set up a reserve against this $72,000 of bankrupt accounts was justified because they were covered by policies of credit insurance. A mere cursory examination of the policies shows that over $32,000 of these accounts were not covered by the policies at all. Thus the reserve was shown to be inadequate by this one account alone. In addition, defendants' own work sheets showed that $14,000 of these bankrupt accounts had been with the insurance company from three years to fifteen months without action. There was expert testimony which a jury was at liberty to believe that a reserve of at least $46,000 should have been established against this account.

We find, also, a $10,000 demand note listed as part of the assets without reserve although it had been overdue and in the hands of an attorney, who had been unable to collect, for two years.

In connection with the foregoing items we have been concerned with evidence from which a jury might find that defendants had actual knowledge that the condition of the items in the balance sheet was not as represented. In the account of E. Heller & Bros., on the other hand, plaintiff contends that the evidence was sufficient to justify a jury in finding that there were circumstances appearing on the books which were so unusual and suspicious that proper accounting practice required defendants to make an investigation. The Heller account involved over $800,000 of the assets of Pelz-Greenstein. During the first eleven months of 1928 sales by the Heller Company never exceeded $191,000 a month, and averaged about $129,000. In December, just preceding the report of the accountants, sales were listed in the books as having jumped to $491,000. The amount included $300,000 of wholly fictitious sales. Plaintiff contends that this sudden increase of approximately $300,000 for the month should have put defendants on notice that something was wrong. Investigation was at least called for and would have disclosed the fictitious accounts.

We come now to evidence from which a jury could find that these defendants were at least heedless and reckless in purporting to reflect the condition of the books. We have an allowance of $101,000 for "doubtfuls" and "discounts," $86,000 of this $101,000 being for discounts and $15,000 for doubtfuls in the item of Accounts Receivable for $3,200,000. There was evidence that these figures for doubtfuls and discounts were arrived at, not by computation on the basis of business done during the year 1928, but by accepting the figures used for the year 1927. The working papers used by defendants for 1927 showed that in that year the amount of discounts had been based originally upon usual accounting practice, and was much larger than the final figure adopted by the accountants. Also, the original allowance for doubtfuls

was greater than the final figure. On the basis of these higher figures, however, the profit for the year 1927 was less than the amount of dividends declared for that year. The reserves for discounts and for doubtfuls were then reduced so as to establish a profit in excess of the dividends for the year. The haphazard method used in arriving at these figures and the failure to follow usual accounting practice supports the contention urged by plaintiff, without answer or explanation upon this record, that defendants, in preparing this balance sheet, were negligent to such an extent as to amount to a reckless disregard for the accuracy necessary for a balance sheet to give the proper reflection of the condition of the business.

The record contains many other important items of evidence to enumerate which would unduly extend this opinion, now beyond reasonable limits.

The foregoing presents abundant evidence from which a jury could find that defendants knew facts which vitally affected the financial worth of Pelz-Greenstein, and which defendants totally suppressed on the certified balance sheet but disclosed to Pelz-Greenstein alone in the one copy of the covering letter sent thirty days later. The jury further could have found that the computation of reserves on the certified balance sheet was a misrepresentation which did not reflect the facts as known to defendants, and which they in good faith should have revealed. Where the record shows acts on the part of the accountants, as outlined above, we cannot say, as a matter of law, that plaintiff has failed to make out a case for the jury.

This brings us to the question of reliance. Defendants contend that the difference between the estimated balance sheet furnished by Pelz-Greenstein and the certified balance sheet prepared by them was such that as a matter of law plaintiff must have disregarded their certified balance sheet in making the loan and decided to make the loan solely on the basis of the estimated balance sheet

of Pelz-Greenstein. In so contending defendants disregard the uncontradicted evidence that the certified balance sheet substantially corroborated the estimated balance sheet, the differences being only those which an audit would ordinarily produce. A mere comparison of the two balance sheets discloses that there was ample evidence from which a jury could find that the certified balance sheet was a substantial corroboration of the estimated balance sheet. When the items of cash receivable, commission accounts receivable and subscriptions on the two balance sheets are totaled they show a total for the estimated balance sheet of $7,760,000 and for the certified balance sheet of $7,650,000, the latter figure being net after deducting reserves of about $121,000. As the estimated balance sheet showed no reserves, the actual discrepancy in assets between the estimated and certified balance sheet was only about $11,000. Furthermore, the only substantial difference between the balance sheets was that defendants listed a number of items as non-current assets which the estimated balance sheet had listed as current assets. It cannot be said, therefore, that there was no evidence that the certified balance sheet substantially corroborated the estimated balance sheet. It is undoubtedly true that, in making the loan, there was reliance upon the then reputations of Pelz and Greenstein. But this does not preclude reliance also upon defendants' certified balance sheet. Evidence of such reliance is to be found in the uncontradicted testimony of the witnesses testifying for the plaintiff. Also it is to be found in the fact that the plaintiff would not make any but a demand loan until receipt of the certified balance sheet, and that it was only after it had received and examined the certified balance sheet that it made the time loan. The fraudulent misrepresentations on the part of defendants need not be the sole inducing cause of the damage. It is sufficient if such representations be an inducing cause. (*Ochs* v. *Woods*, 221 N. Y. 335; *Laska* v. *Harris*, 215 N. Y. 554.)

In addition the defendants rely on the fact that plaintiff renewed the note on several occasions so as to extend it for more than a year, and that when the precarious condition of Pelz-Greenstein Company was discovered plaintiff agreed to participate in a pooling of assets agreement with several other banks. Defendants knew that Pelz-Greenstein Company was seeking a line of credit from plaintiff and that the original note, if granted, would be extended subsequently. There is abundant evidence to show that these extensions were made in reliance upon the certified balance sheet, and, although other factors may have been considered, they do not constitute a sole and independent cause which brought about the loss rather than the misstatements in the balance sheet. (See *Hotaling* v. *Leach & Co.*, 247 N. Y. 84, 93.) The pooling agreement was to plaintiff's advantage and helped to minimize the loss.

Finally, defendants argue that plaintiff was not damaged by reason of the balance sheet because at the time it was issued plaintiff already had made a demand loan of $300,000, and the company, according to plaintiff's allegations, was insolvent at that time. There can be no doubt that if at the time the balance sheet was issued plaintiff had been informed of the true condition of Pelz-Greenstein Company it would have insisted upon immediate payment of the demand loan, and there is evidence from which it can be found that at that time full payment of the loan could have been obtained.

Upon all the evidence it cannot be said as a matter of law that plaintiff has failed to make out a *prima facie* case against defendants.

The judgments should be reversed and a new trial granted, with costs in all courts to abide the event.

LEHMAN, J. (dissenting). The defendants, a firm of accountants, were employed by the Pelz-Greenstein Company to examine the books of the company and to prepare a certified balance sheet of its financial position. To

their employers they owed a duty to perform their work with care and with the skill which they represented they had, as professional accountants. They owed no such duty to persons who might deal with Pelz-Greenstein Company, upon the basis of the certified balance sheet prepared by the defendants. To such persons they owed only the duty to refrain from making any fraudulent misrepresentations. (*Ultramares Corp.* v. *Touche,* 255 N. Y. 170.) The courts below have held, without dissent, that the evidence is insufficient to permit an inference of fraud as defined in that case.

The only representations made by the defendants are contained in the balance sheet which they prepared after examining the books of account of the Pelz-Greenstein Company and the certificate appended thereto. The certificate states: " We hereby certify that we examined the books of account and record pertaining to the assets and liabilities of Pelz-Greenstein Co., Inc., New York City, as of the close of business December 31 1928, and, based on the records examined, information submitted to us, and subject to the foregoing notes [not material here], it is our opinion that the above condensed statement shows the financial condition of the company at the date stated and that the related income and surplus account is correct."

To prepare a balance sheet, accountants must, of course, examine the books and accounts submitted to them, and from such examination and any other information which may be furnished to them, they must prepare a balance sheet which, *in their opinion,* reflects the true financial position of the business. The certificate of the defendants constitutes an express representation of *fact* that they have " examined the books of account and record pertaining to the assets and liabilities of Pelz-Greenstein Co., Inc." The balance sheet itself represents and was understood to represent only the " opinion " of the defendants based " on the records examined " and on information presented to the defendants.

It is undisputed that the defendants did examine the books and accounts of Pelz-Greenstein Company and that the balance sheet is based upon entries in those books and accounts. It is also undisputed that the balance sheet did not show the true financial position of the business. According to the balance sheet, the corporation had assets of about $8,000,000 and debts of less than $5,000,000; its capital of over $3,000,000 was unimpaired and it had, a surplus of about $83,000. In fact the corporation was insolvent; its liabilities exceeded the fair value of its assets. The defendants did not, however, warrant, or certify, the accuracy of the balance sheet; they represented only that the balance sheet was in " their opinion " correct. May they be held responsible for loss caused to the bank by reliance on this expression of opinion? That is the problem presented upon this appeal.

The defendants are not liable for error of judgment; they are not liable even for lack of care in arriving at their opinion. They are liable only if the opinion expressed was not only erroneous, but was fraudulently expressed. Actual bad faith and intent to deceive is not always, it is true, an essential element in a cause of action for deceit. Such a cause of action may be established against the defendants without proof that they expressed an opinion which they knew was incorrect; at least, however, there must be evidence of a ruthless disregard of whether the opinion was correct or not — the expression of an opinion where " the grounds supporting it are so flimsy as to lead to the conclusion that there was no genuine belief back of it." ( *Ultramares Corp.* v. *Touche, supra,* p. 186.)

In that case we said that " negligence or blindness, even when not equivalent to fraud, is none the less evidence to sustain an inference of fraud. At least this is so if the negligence is gross " (p. 190). That rule was not new; it had been applied in earlier cases cited in the

opinion. Again and again, however, in that opinion, as in the cases cited, the court pointed out that even gross negligence is not equivalent to fraud. It may, in proper case, furnish sufficient evidence to justify an inference of fraud, but that is true only when the proof of gross negligence shows that the grounds supporting the opinion are in fact " so flimsy *as to lead to the conclusion* that there was no genuine belief back of it. *Further than that this court has never gone.*" (Italics are mine.) ( *Ultramares Corp.* v. *Touche, supra,* p. 186.)

Judge FINCH has, in his opinion, referred to the evidence upon which he bases his conclusion that it establishes fraud. I shall try to avoid repetition of that evidence. The most important of the alleged errors in the balance sheet is the failure to provide sufficient reserves for the collection of " commission accounts receivable." The amount of reserves which should be set aside to take care of loss that may be suffered by reason of inability to collect such accounts is a matter of judgment. The defendants knew of circumstances which it is said pointed clearly to the conclusion that a reserve of $21,000 is insufficient to take care of these accounts of over $2,043,337.81. Perhaps the defendants here showed a lack of caution. Their letter sent thirty days after the certified balance sheet was sent, shows that they knew that the reserve *might* prove insufficient. None the less, the amount of probable loss even with these circumstances known remained uncertain; the estimate of one per cent loss was doubtless over-optimistic, yet the estimate was based on facts which were not " so flimsy as to lead to the conclusion that there was no honest belief back of it " (p. 186).

The next error which, it is argued, shows negligence so gross as to indicate a lack of honest belief based on substantial grounds is that no allowance was made for " commission account advances." Many of these accounts were old. Again there are circumstances which

perhaps should have acted as a warning signal to a cautious accountant. The defendants saw the signal — that is shown by the supplementary letter — but decided, nevertheless, to make no allowance. Again it would, doubtless, have been better if the defendants had given to those who might rely upon the balance sheet, the warning signal they had seen. They did, however, give notice on the balance sheet that accounts were "inactive and in liquidation" and they removed them from the current assets of the business and placed them "below the line." The owners of the business, men who at that time had a fine reputation, assured the defendants that they had sufficient security to liquidate these dead accounts. I can find here no justification for any argument that a balance sheet which shows that no allowance or reserve has been made for inactive accounts in liquidation may be held to be a fraudulent representation that no allowance or reserve is necessary.

I agree that the jury might find gross negligence in failure to provide a reserve of $46,000 against a group of bankrupt accounts aggregating $72,000. Even gross negligence in regard to an item of $46,000 in a balance sheet showing assets of almost $8,000,000 can hardly be regarded as substantial evidence of fraudulent misrepresentation. I do not take up in detail the other items where it is said the jury might find gross negligence. Each one involves the exercise of judgment; in none does it appear that there was no ground for honest exercise of judgment.

Certainly there is here no deliberate intention to deceive, no statement of *fact* made without actual knowledge, no statement of an opinion which the defendants did not honestly hold; nor, with the possible exception of the one item of $46,000, is there any evidence of an expression of opinion made by a person careless as to whether it was based on sufficient knowledge. The case is entirely different from that presented by *Ultramares*

*Corp.* v. *Touche* (*supra*). There the defendants certified that the balance sheet corresponded with accounts which the jury might find had not been examined by the defendants, or had been disregarded by them; and the court pointed out " that in certifying to the correspondence between balance sheet and accounts " (p. 192), the defendants made a statement as true to their own knowledge, when they had, as a jury might find, no knowledge on the subject.

Here the defendants examined adequately the books and data which they certified they had examined, and they are not charged with either bad faith or even negligence in making their examination. The balance sheet corresponds with the books and if the defendants were negligent, their negligence, whether gross or slight, consisted only in failure to give to the information, which they obtained through such examination, the effect which expert witnesses testify should, in their opinion, be given to it. The defendants realized that this information might reasonably affect their judgment. The explanatory letter which they sent later shows that. The jury might find that the defendants' judgment was bad, but the court pointed out in the *Ultramares* case that liability cannot be predicated upon error however great in the exercise of judgment. The error of judgment does not indicate a willful expression of a false opinion, or an expression of opinion based on grounds so flimsy that the jury might conclude that the opinion was not based on genuine belief. To permit recovery in a case where the evidence does not sustain such a conclusion is to wipe out the distinction which this court has always drawn and which it reiterated in the *Ultramares* case.

The judgment should be affirmed.

O'BRIEN, LOUGHRAN and RIPPEY, JJ., concur with FINCH, J.; LEHMAN, J., dissents in opinion in which CRANE, Ch. J., concurs; HUBBS, J., taking no part.

Judgments reversed, etc. (See 278 N. Y. 704.)