**The CHASE MANHATTAN BANK, Plaintiff,**

v.

**MOTOROLA, INC., Defendant.**

**No. 00 CIV 4838(AKH).**

United States District Court, S.D. New York.

Feb. 11, 2002.

Barry R. Ostrager, David J. Woll, Mary Kay Vyskocil, Michelle A. Kisloff, Simpson, Thacher & Bartlett, New York City, for Plaintiff.

Joseph Serino, Jr., Kimberly Ziev Niehaus, Kirkland & Ellis, New York City, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HELLERSTEIN, District Judge.

### I. FINDINGS OF FACT

1. This is a breach of contract action in which The Chase Manhattan Bank ("Chase") seeks to enforce a $300 million guarantee obligation by Motorola, Inc. ("Motorola"), pledged by Iridium Operating LLC ("Iridium") as collateral for an $800 million loan by Chase and a consortium of lenders represented by Chase (collectively, the "Lenders").

2. The following findings of fact and conclusions of law concern only Chase's claims in this suit. Motorola's counter-

claim has not yet been tried by the parties, and I therefore will not address it here.

3. The scope of the issues properly within my jurisdiction was defined by my earlier decision, filed on March 29, 2001, denying Chase's motion to remand this case to the New York Supreme Court, from which it had been removed. The March 29 decision sets out the history of Iridium, the role of Chase as Collateral Agent and Administrative Agent for a consortium of participating banks, that only Chase has the right to seek enforcement against Motorola of its guarantee obligation, and that, in consequence, the diverse citizenship of Motorola and Chase is sufficient basis for the district court's jurisdiction.

## A. Factual Background

4. In the 1980's, Motorola began to develop a global satellite communications system. The project was called "Iridium." Trial Tr. at 233. In 1993, Iridium was spun off from Motorola and became an independent company with outside investors. Trial Tr. at 102; Trial Tr. at 305.

5. Iridium was intended to be a global communications system that would utilize a traditional terrestrial network and a constellation of over sixty low-earth orbit satellites to allow subscribers to make and receive phone calls and pages anywhere in the world.

6. Iridium launched its commercial service on November 1, 1998, before all components of the system had been proved and before it was ready for full commercial launch. DX I3; Trial Tr. at 231; Trial Tr. at 519.

7. The banking relationship between Chase and Iridium developed in the mid–1990s. DX N9; Trial Tr. at 206. Chase participated in Iridium's significant financings. Chase was the Global Arranger for syndicated bank debt Iridium raised in 1996, 1997 and 1998; the lead manager for three high yield debt offerings by Iridium in 1997 and 1998; an underwriter for Iridium's public equity offerings; and a general financial advisor to the company. Trial Tr. at 206, 325–26, 486; DX I3.

## B. 1998 Financing and Documents

8. On December 23, 1998, Chase and two syndicates of lenders extended loans totaling $1.55 billion to Iridium. One loan of $750 million, not in issue in this case, was extended through a Senior Guaranteed Credit Facility, and was guaranteed in full by Motorola. Ex. I3 at 10. A second loan of $800 million was extended through a Senior Secured Credit Agreement between Iridium and Chase (the "Loan"). Motorola's guarantee obligation in respect of this loan gives rise to the issues of this case.

9. Four contracts are relevant to the Loan, all executed on December 23, 1998:

(a) The Senior Secured Credit Agreement, executed by Iridium, Chase and the other members of the syndicate, PX 111;

(b) The Second Amended and Restated Memorandum of Understanding, executed by Iridium, Iridium LLC and Motorola (the "MOU"), PX 112;

(c) The Motorola Consent, executed by Iridium, Motorola and Chase, PX 113; and

(d) The Pledge and Security Agreement, executed by Iridium, several of its subsidiaries and Chase, PX 114.

The four agreements are interrelated, and reference each other and their respective terms and conditions.

10. Pursuant to the MOU, Iridium had the right to request Motorola to provide it with up to $300 million to secure the Loan (the "Motorola Guarantee"). Iridium made such request to Motorola, and Iridi-

um thereupon pledged and assigned the Motorola Guarantee to the Lenders as Collateral for the Loan, and Motorola consented thereto, all as reflected by the agreements referred to above. *See* ¶ 9.

11. The Credit Agreement, PX 111, referring to the Motorola Guarantee and Iridium's pledge and assignment thereof, provides that "not later than seven Business Days after the occurrence of any Trigger Event, [Iridium] will require Motorola to perform the Motorola Guarantee (to the extent of a maximum amount of $300,000,000.") PX 111, § 8.09(a). A Trigger Event is defined as the occurrence of any one of several events, including (a) any Event of Default, or (b) Iridium's failure to achieve certain defined financial targets, including "cumulative adjusted accrued revenues" by February 28, 1999 of $25 million. *Id.*, § 1.01 at 26–27.

12. The Motorola Consent, PX 113, sets out Chase's rights against Motorola with respect to Iridium's pledge of collateral: "to exercise all rights, powers and remedies of Iridium" against Motorola with respect to Motorola's Guarantee. PX 113, § 3.08(a). The Motorola Consent further provides that Motorola consents to the assignment by Iridium and acknowledges that Chase has the right to proceed directly against Motorola on Motorola's Guarantee. *Id.*

13. Section 3.08(a) of the Motorola Consent provides that

[a]t any time after the occurrence and during the continuation of any Event of Default, [Chase] shall have the right to exercise all rights, powers and remedies of Iridium under the MOU Agreements ... including without limitation the right to require Motorola to provide the Motorola Guarantee in a maximum amount of $300,000,000 pursuant to Section 1(e) of the Memorandum of Understanding .... Motorola agrees that [Chase] may exercise such rights, pow-

ers and/or remedies directly against Motorola under such circumstances ... so long as any Event of Default shall be continuing and Motorola has received written notice thereof from [Chase] ....

PX 113, § 3.08(a)

14. Section 3.08(b) of the Motorola Consent provides that

upon the occurrence of a Trigger Event, if Iridium shall fail to perform its obligations under Section 8.09 of the [ ] Credit Agreement, [Chase] may require, by written notice, Motorola to provide the Motorola Guarantee in accordance with Section 1(e) of the Memorandum of Understanding. Motorola agrees, upon receipt of such notice, promptly to so provide the Motorola Guarantee.

PX 113, § 3,08(b).

15. Section 3.09(c) of the Motorola Consent states that

[w]ithout limiting any other provision of this Agreement, Motorola will not amend, waive or otherwise modify, or agree to any amendment, waiver or modification, or terminate or cancel any provision under the MOU Agreements to the extent relating to its obligations under paragraph 1(e) of the Memorandum of Understanding without the prior written consent of [Chase].

PX 113, § 3.08(c).

16. Section 3.08(e) of the Motorola Consent provides that the Motorola Guarantee "shall terminate upon the earlier of the Guarantee Obligation Termination Date and the Guarantee Obligation Release Date." PX 113, § 3.08(e).

17. "Guarantee Obligation Termination Date," *see* PX 113 § 3.08(e), is defined (by reference to Section 8.09(b) of the Credit Agreement, *see* PX 113, § 1.01) as a date on which no Default under the Credit Agreement had occurred and was continuing, and Iridium "delivered to [Chase] a

certificate of its chief financial officer in form and substance reasonable satisfactory to [Chase]" representing that as of such date:

(a) No Default under the Credit Agreement had occurred and was continuing;

(b) Iridium was in compliance with the requirements of Section 8.07 of the Credit Agreement, that is, Iridium was maintaining the "Iridium System" in a manner consistent with the achievement of the November 1998 "Financial Projections";

(c) Iridium had "committed or available finding" to meet all projected costs to the maturity date of the loan (December 29, 2000); and

(d) Iridium had received at least $250 million in proceeds from a public equity offering before February 28, 1999.

PX 111, § 8.09(b).

18. A "Default" is defined (by reference to the Credit Agreement) as "any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default." PX 111, § 1.01 at 7. An Event of Default would occur if, *inter alia:*

(a) "[A]ny representation or warranty made or deemed made by [Iridium] ... in any ... certificate ... furnished pursuant to or in connection with this Agreement or any other Credit Document ... shall prove to have been incorrect in any material respect when made or deemed made," PX 111, § 9.01(d); and

(b) "[Iridium] shall fail to observe or perform any covenant, condition or agreement contained in [*inter alia*] Article VII (other than Sections 7.06 and 7.09)." *Id.*, § 9.01(e).

19. An Event of Default includes failing to meet Financial Covenants provided by Section 7.10 of the Credit Agreement. *See* PX 111, § 9.01(e). The Financial Covenants obligate Iridium to achieve minimum subscriber and minimum revenue goals by quarterly dates. PX 111, § 7.10. As of March 31, 1999, Iridium was to have at least $30 million cumulative accrued revenues, $4 million cumulative cash revenues, 52,000 total subscribers, and 27,000 Total Satellite Subscribers. *Id.*, § 7.10(a). The Financial Covenants were the result of intense bargaining, and the parties regarded them as material. *See, e.g.,* Trial Tr. at 281:4—284:18.

20. The "Financial Projections" provided in the Confidential Information Memorandum ("CIM") reflect quarterly revenue and subscriber goals set by Iridium management. The Financial Projections set higher goals than the Financial Covenants, and provided that, as of March 31, 1999, Iridium was to produce at least $83 million in revenues and have at least 69,000 total subscribers. PX 65 at CH–DE 0120827. Pursuant to Section 8.07 of the Credit Agreement, Iridium was to maintain the Iridium System consistent with the Financial Projections. *See* PX 111, § 8.07.

## C. The Certificate and Its Aftermath

21. On February 11, 1999, Iridium provided to Chase a Certificate, PX 223, dated February 10, 1999 and signed by its Chief Financial Officer, Roy Grant, representing that:

(a) "As of the date hereof, no Default has occurred or is continuing."

(b) "As of the date hereof, the Company is in compliance with Section 8.07 of the Credit Agreement."

(c) "As of the date hereof, the Company has committed available funding to meet all projected costs to (but not including) the Maturity Date."

PX 223.

22. Attached to the Certificate were two schedules. Schedule I listed the oper-

ational satellites in orbit and set forth the recent performance results of the Iridium System for satellite voice, paging and cellular roaming services. Schedule II provided a table of projected cash flows, setting forth projected revenues and costs and listing sources of funding committed or available to Iridium through the Maturity Date.

23. Pursuant to the operative agreements, Iridium had the right, but not the obligation, to issue the Certificate. By issuing the Certificate, Iridium intended to terminate the Motorola Guarantee.

24. The Credit Agreement requires that representations in the Certificate not be incorrect in any material respect when made, PX 111, § 9.01(d), and that the Certificate contain no "untrue statement of material fact" or omit any statement of material fact necessary to prevent the Certificate from being misleading, *Id.* at § 3.15. If "any representation or warranty made or deemed made by [Iridium] ... in any ... certificate ... furnished pursuant to or in connection with the Agreement or any other Credit Document ... shall prove to have been incorrect in any material respect when made," an Event of Default is deemed to have occurred. PX 111, § 9.01(d).

25. The Credit Agreement requires the Certificate to be "in form and substance reasonably satisfactory to [Chase]." PX 111, § 8.09(b)(iii). After reviewing the Certificate, Chase determined that the Certificate was "satisfactory in form and substance." DX H4; Trial Tr. 356–59 and 376.

26. Chase expressed its acceptance of the Certificate to the other lenders in the syndicate on February 12, 1999:

> Following Iridium's successful equity offering of $250 million on January 27, 1999, the certificate of Roy Grant, chief financial officer of Iridium [was] delivered under Section 8.09(b) of the Senior Secured Credit Agreement relating to the release of the $300 million Motorola guarantee obligation. As the certificate complies with the requirements of Section 8.09(b), the Administrative Agent has accepted the certificate and so advised Iridium as of today's date, and therefore the Motorola guarantee obligation is released for purposes of [the] Credit Agreement.

DX H4; *see also* Trial Tr. at 321–22.

27. Chase questioned Iridium's good faith in issuing the Certificate and demanded reinstatement of the Motorola Guarantee, in a meeting between Chase and Motorola in mid-April 1999. On July 13, 1999 and again on July 29, 1999, Chase gave written notice that it considered the February 10 Certificate to be materially inaccurate and demanded that Motorola perform the Motorola Guarantee. PX 343, 350.

28. On August 2, 1999, Motorola rejected Chase's demand for the Motorola Guarantee, relying on the Guarantee Obligation Termination Date it believed was triggered when Iridium issued the February 10 Certificate. DX J7. This lawsuit followed.

### D. Findings Regarding the Certificate and Its Issuance

29. As of February 11, 1999, when Iridium issued the Certificate, and thereafter, Iridium lacked a good faith basis to represent in the Certificate that:

(a) Iridium had committed or available funding to meet all projected Costs to (but not including) the Maturity Date, that is, through December 31, 2000;

(b) Iridium was in compliance with § 8.07 of the Credit Agreement; or

(c) No Default had occurred and was continuing.

**(1) Iridium Had No Good Faith Basis For Representing that It Had Sufficient Committed or Available Funding Up To the Maturity Date**

30. Iridium's representation, that it had committed or available funding through December 2000, assumed that it would not be in default on its debt of $2.8 billion, and that it said debt would not be called by creditors. However, if Iridium defaulted on the Credit Agreement, cross-defaults of all of Iridium's debt covenants would be triggered, accelerating all of Iridium's indebtedness. *See* PX 403; PX 163A at IR 65599; *see also* Trial Tr. at 296:4–12.

31. Iridium had no basis as of the date it issued the Certificate to believe that it would achieve Cumulative Adjusted Accrued Revenues by February 28, 1999 of $25 million, or that it would be able to satisfy the Financial Covenants as of March 31, 1999. Accordingly, as of the date it issued the Certificate, Iridium knew that conditions existed which, "upon notice, lapse of time or both would, unless cured or waived, become an Event of Default." *See* PX 111, §§ 1.01 at 7, 9.01(e). A default under the Credit Agreement would cause a cross-default of all Iridium's debt and accelerate its outstanding debt, which Iridium lacked sufficient funding to pay.

32. Iridium's senior management, its Banking and Finance Committee, and the officers of Motorola who were members of Iridium's Banking and Finance Committee knew that Iridium would be in Default under the Credit Agreement. PX 140; *see also* PX 175 at MOT 1,552,308; PX 163; PX 164 at MOT 1,463,397.

33. The various members of Iridium management who stated that they believed that there could be a dramatic and timely ramp-up of Iridium's sales and revenues had no reasonable basis for such belief:

(a) At the time Iridium issued the Certificate, the independent Iridium Gateway companies, which exercised control over the pricing, marketing and sale of Iridium products and services in their marketing territories, were projecting that by March 31, 1999 Iridium would have only 123,000 Total Subscribers, 53,552 Satellite Subscribers, $23,351,000 in cumulative accrued revenue and $3,892,000 in cumulative cash revenue. DX N9; Trial Tr. at 125:22–126:8; DX I3 at MOT–K 2345; PX 140 at IR 213835–36. The projections of the Iridium Gateway companies showed clearly that Iridium inevitably would be in Default under the Credit Agreement.

(b) Although Iridium proposed a "Gateway Rev–Up Project" to boost sales and the Gateways' projections, *see* PX 163A at IR 065652, Iridium knew that actual revenue and subscriber results as of February 10, 1999 were far below the targets provided by the Credit Agreement and that the Rev–Up Project could not make up the deficiency in time. *See* PX 403; *see also* Trial Tr. at 161:15–18, 16213–17; Trial Tr. at 241:2–6.

(c) Equipment problems continued. In particular, Kyocera handsets, one of the two handsets for use with the Iridium system, continued to be unavailable due to quality problems that the company could not solve. *See* PX 271; Trial Tr. at 525:22–526:12, 558:17–23. Without handsets in adequate number, the provisions of the Credit Agreement could not be satisfied.

(d) Distribution problems continued. In particular, Iridium's distribution channels were not adequate to supply Motorola handsets to projected subscribers at a sufficient rate. *See* PX 103; Trial Tr. at 559:16–21.

(e) Actual results continued to be deficient. Iridium's weekly sales report for the week ending February 8, 1999 showed that Iridium had signed up only 6,009 subscribers to that date and had generated only $535,000 in accrued revenues, compared with 52,000 subscribers and $30 million in cumulative accrued revenues needed to satisfy the first quarter Covenants (and $25 million to satisfy the Financial Targets for February 28, 1999). PX 226. The report also stated that, for the week ending February 8, 1999, Iridium had added an average of only 65 new subscribers per day, and increased its accrued revenues by an average of only $23,000 per day. PX 224. In order to reach the Financial Covenants, Iridium would be required to have added nearly 900 subscribers per day and generate accrued revenues of over $577,000 per day.

(f) Management had no good faith basis to believe that Iridium's success years before in the development and marketing of cellular phones was relevant or could provide basis to believe that Iridium could overcome its lack of progress in solving the technological and marketing issues involved with its far more complicated extra-terrestrial system. *See* DX N9.

**(2) Iridium Had No Good Faith Basis To Represent that It Was In Compliance With Section 8.07 of the Credit Agreement**

34. Section 8.07 of the Credit Agreement required that the "Iridium System" be maintained in a manner "consistent with the achievement of the Financial Projections," as set forth in Section 9 of the CIM. PX 111, § 8.07; *see also* PX 111, § 1.01, at CH–DE 0000015.

35. The "Iridium System," that is, "the IRIDIUM ® global wireless communications system described in the Information Memorandum [the CIM]," PX 111, § 1.01, at CH–DE 0000019, has four components:

(a) the "space segment," which includes the low earth orbit satellite constellation and the related control facilities;

(b) the ground stations, or "gateways," which link the satellite to terrestrial communication systems;

(c) the Iridium phones, pagers and subscriber identity module ("SIM") cards, which provide mobile access to the satellite constellation and land-based cellular systems; and

(d) the land-based wireless roaming infrastructure, which facilitates roaming among the Iridium satellite system and many land-based cellular systems—even cellular systems that use different wireless protocols.

PX 65 at CH–DE 0120746.

36. As of February 10, the Iridium System was not "being maintained" consistent with the Financial Projections:

(a) Iridium could not distribute enough Iridium handsets by March 31, 1999 to the projected number of voice subscribers;

(b) The lack of roaming partners rendered the land-based roaming infrastructure of the Iridium System ineffectual; and

(c) Iridium could not distribute enough cellular cassettes by March 31, 1999 to the projected number of cellular roaming subscribers.

37. Iridium was unable to supply enough handsets to achieve 355,400 voice subscribers by March 31, 1999, the number of voice subscribers provided by the Financial Projections. *See* PX 65 at CH–DE 0120831. To access the Iridium System,

subscribers needed handsets capable of sending and receiving signals from the Iridium satellite constellation. *See* PX 65 at CH–DE 0120748; Trial Tr. at 254:24–255:1. These handsets were to be manufactured by either the Kyocera Corporation ("Kyocera") or Motorola. *See* PX 65 at CH–DE 0120748. As of February 10, Kyocera was unable to manufacture handsets of satisfactory quality, and Motorola had manufactured and shipped at most 38,000 handsets, far less than needed by March 31. *See* PX 148 at MOT 1,376,291; PX 260 at MOT 1,379,987; Trial Tr. at 238:6–11. Motorola's production capacity for Iridium handsets was between 26,000 and 30,000 per month or between 750 and 1,000 per day, *see* Trial Tr. at 224:9–11; Trial Tr. at 530:9–16; DX I3 at MOT–K 2324, and in the 50 days between February 10 and March 31, 1999, Motorola could not have manufactured and shipped enough handsets to satisfy the projected subscribers. Iridium therefore had no reasonable basis to certify on February 10 that the Iridium System was being maintained in a manner consistent with achieving the Financial Projections.

38. Further, Iridium was not maintaining the Iridium System in a manner consistent with the Financial Projections because, as of February 10, the land-based roaming infrastructure was substantially deficient in several respects. Iridium had not yet entered into "Roaming Partner" agreements with cellular network operators in 18 of the 27 key markets that accounted for 80% of Iridium's business plan, *see* PX 163A, and the existing roaming partners largely had not launched Iridium service and were not ready to serve Iridium customers on their local networks. *Id.* Since a considerable portion of Iridium's roaming functionality did not work, Iridium could not be maintaining the Iridium System in a manner consistent with achievement of the Financial Projections.

39. Finally, as of February 10, Iridium did not have enough subscriber equipment to meet its cross-protocol cellular roaming needs and, in this respect as well, was not maintaining the Iridium System consistent with the Financial Projections. *See* Trial Tr. 641:16–19. A subscriber could access the cellular roaming portion of the Iridium System in one of two ways: (a) through Kyocera dual-mode handsets designed to access the cross-protocol roaming portion of the Iridium System without any supplemental components, *see* DX I3 at MOT–K 2319; or (b) through the Motorola handset via insertion of Terrestrial Radio Cassettes, *see* Trial Tr. 641:16–19. Neither type of equipment could have been available in sufficient numbers to satisfy the 286,400 subscribers of cellular roaming services called for in the Financial Projections: Kyocera handsets were qualitatively deficient and therefore were not available and it was unknown when they would be available; Motorola could not manufacture enough cellular cassettes in time. *See* PX 163A. As equipment problems hampered Iridium's fulfillment of the cross-protocol cellular roaming system, Iridium was not maintaining the Iridium System in a manner consistent with the achievement of the Financial Projections.

(3) **Iridium Had No Good Faith Basis To Represent that No Default Had Occurred and Was Continuing**

40. When Iridium issued its Certificate on February 11, 1999, it had only 17 days before it was required to achieve, as of February 28, 19999, Cumulative Adjusted Accrued Revenues of $25 million. *See* PX 111, § 1.01. As previously discussed, Iridium knew, at the time of its Certificate, that it could not achieve those revenues. *See* ¶¶ 30–33, *supra.* Similarly, at the time it issued the Certificate, Iridium knew that it could not achieve the March 31, 1999 Financial Covenants. *See*

*id.* The failure to satisfy the Financial Covenants constitutes an Event of Default and therefore also a Trigger Event. *See* PX 111, §§ 1.01, 9.01(e). The failure to satisfy the Financial Targets constitutes a Trigger Event. *See* PX 111, § 1.01 at 26.

41. Also as previously discussed, at the time it issued the Certificate, Iridium knew that it had not maintained, and could not maintain, the Iridium System consistent with the Financial Projections set for March 31, 1999. *See* ¶¶ 34–39, *supra.* The failure to maintain the Iridium System consistent with the Financial Projections constitutes an Event of Default and therefore also a Trigger Event. *See* PX 111, §§ 1.01, 9.01(e).

42. Iridium's representation that no Default had occurred or was continuing as of February 10, 1999 misrepresented that the conditions then existing would, unless cured or waived, inevitably become Events of Default. Iridium's failure to disclose such conditions made Iridium's representation on February 10 that no Default had occurred or was continuing materially untrue and therefore false and misleading.

43. Iridium failed to generate sufficient revenue to satisfy either the Financial Targets set for February 28, 19999 or the Financial Covenants set for March 31, 1999. *See* PX 260 (noting that as of February 26, 1999, Iridium's cumulative accrued revenues totaled $900,000); PX 283 (March 16, 1999 waiver, giving Iridium until May 31, 1999 to meet the March 31, 1999 Financial Covenants); PX 334 (May 28, 1999 waiver, giving Iridium until June 30, 1999 to meet the March 31, 1999 Financial Covenants).

#### (4) Additional Indicators that Iridium Did Not Issue the February 10 Certificate in Good Faith

44. Roy Grant, Iridium's Chief Financial Officer and who executed the Certificate on behalf of Iridium, despite know-ing that all financial measurements were substantially below targets and could not reasonably be made up, performed no significant due diligence, nor did he assign anyone else the obligation to do significant due diligence, in the weeks before he issued the Certificate to determine whether the representations made therein were accurate and not misleading. PX 403. The absence of any such due diligence shows a purposeful indifference to the available facts and, therefore, the absence of good faith.

45. Members of Iridium's senior management sold shares of Iridium stock in significant numbers around the time the Certificate was issued. For example, on February 10 and 11, 1999, Grant sold all the Iridium stock he could, either directly or through the exercise of options, netting over $700,000. PX 403. Other senior officers of Iridium also sold significant portions of their Iridium holdings during early to mid February. These sales suggest that Iridium had no reasonable or honest belief in the representations made in the February 10 Certificate.

#### (5) Consequence of Iridium's Untrue Representations and Bad Faith

46. The untrue statements of material facts contained in Iridium's February 10 Certificate, and Iridium's lack of good faith in making such representations and issuing its Certificate, constituted Events of Default under the Credit Agreement.

### II. CONCLUSIONS OF LAW

47. Subject matter jurisdiction over this action exists pursuant to 28 U.S.C. § 1332, for the reasons set out in my Memorandum and Order Denying Plaintiff's Motion to Remand filed March 29, 2001. There is complete diversity of citizenship between Chase and Motorola with regard to this dispute and the matter in controversy exceeds $75,000, exclusive of interest and costs.

48. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a).

49. This dispute is governed by New York law, as provided by the Choice of Law clauses of the operative agreements. *See* PX 111, § 11.09(a); PX 112, § 13(a); PX 113, § 7.08; PX 114, § 5.08(a).

50. The representations of the Certificate were material. A matter is material if "(a) a reasonable man would attach importance to its existence or non-existence in determining his choice of action in the transaction in question"; or "(b) the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it." Restatement of the Law 2d, Torts, § 538; *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) ("An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act].").

51. The Certificate was incorrect in material respects, falsely representing, among other matters, (a) that no Default under the Credit Agreement had occurred or was continuing, (b) that Iridium was in compliance with section 8.07 of the Credit Agreement and was maintaining the Iridium System in a manner consistent with the achievement of required Financial Projections, (c) and that Iridium had committed or available funding to meet all projected costs to the maturity date of the Loan. Iridium and Roy Grant knew that the Certificate was false and incorrect in material respects and issued the Certificate without basis to believe that it was not incorrect, contrary to the requirements of Sections 9.01(d) and 3.15 of the Credit Agreement. False representations, made with knowledge of their fal-

sity, or with indifference as to whether the representations are true or false, are "fraudulent if the maker (a) knows or believes that the matter is not as he represents it to be, (b) does not have the confidence in the accuracy of his representation that he states or implies, or (c) knows that he does not have the basis for his representation that he states or implies." Restatement of the Law 2d, Torts, § 526; *see also Ultramares Corp. v. Touche*, 255 N.Y. 170, 179, 174 N.E. 441 (1931) ("Fraud includes the pretense of knowledge when knowledge there is none."); *State Street Trust Co. v. Ernst*, 278 N.Y. 104, 112, 15 N.E.2d 416 (1938) ("A representation certified as true to the knowledge of the [maker] when knowledge there is none, a reckless misstatement, or an opinion based on grounds so flimsy as to lead to the conclusion that there was no genuine belief in its truth, are all sufficient upon which to base liability. A refusal to see the obvious, a failure to investigate the doubtful, if sufficiently gross, may furnish evidence leading to an inference of fraud so as to impose liability for losses suffered by those who rely on the [representation]. In other words, heedlessness and reckless disregard of consequence may take the place of deliberate intention.").

52. Iridium's issuance of a materially false Certificate was itself an Event of Default, triggering Motorola's duty to perform on its Guarantee. *See* PX 111, § 9.01(d). The materially false Certificate was not a basis for terminating Motorola's Guarantee. *Cf. Lear Siegler Aerospace Prods. Holding Corp. v. Smiths Indus., Inc.*, 1990 WL 422417, at *5 (S.D.N.Y. Mar. 16, 1990) (third-party certification invalid where third party failed to follow standards prescribed in the contract); *Cities Serv. Co. v. Derby & Co.*, 654 F.Supp. 492, 501 (S.D.N.Y.1987) (same).

53. Motorola's defense, that it can rely on a false and misleading Certificate

to terminate its Guarantee, is not valid. As discussed above, Iridium lacked the right to issue the Certificate and thereby terminate Motorola's Guarantee Obligation. *See* PX 111, § 8.09(b)(i). Motorola knew, or was on notice of, the false and misleading nature of Iridium's Certificate because, among other things, officers of Motorola were members of Iridium's Banking and Finance Committee and knew of Iridium's inability to satisfy the provisions of the Credit Agreement.

54. Motorola's defense, that Chase's approval of the "form and substance" of Iridium's Certificate bars Chase from challenging its validity, is not a valid defense. Chase and the other Lenders had an unqualified right to an accurate Certificate. *See* PX 111 § 3.15, 9.01(d). Chase had no obligation to perform due diligence, and was neither "responsible for [n]or ha[d] any duty to ascertain or inquire into (i) any statement, warranty, or representation made in or in connection with this Agreement or any other Credit Document, (ii) the contents of any certificate ... delivered hereunder ..., [or] (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set herein." PX 111, art. 3, ¶ 3. Chase had the right to rely on Iridium's representations in the Certificate "regardless of any investigation made by [it] or on its behalf and notwithstanding that [Chase] or any Lender may have had notice or knowledge of any ... incorrect representation or warranty." PX 111, § 11.05. Furthermore, pursuant to the "no waiver" clause, *see* PX 111 § 11.02(a), ("[n]o failure or delay by [Chase] or any other Lender in exercising any right or power hereunder shall operate as a waiver thereof, nor shall ... any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof."). Such "no waiver" clauses are routinely enforced under New York law. *See CS First Boston v. Behar,*

1996 WL 384893, at *4 (S.D.N.Y. July 9, 1996); *see also Renali Realty Group 3 v. Robbins MBW Corp.*, 259 A.D.2d 682, 686 N.Y.S.2d 855, 856 (2d Dep't 1999).

55. Iridium's issuance of the false and misleading Certificate on February 11, 1999 and the numerous other Events of Default, *see* ¶¶ 40, 41, 43, constituted Trigger Events, requiring Motorola to provide to Chase, upon proper written demand, the Motorola Guarantee in the amount of $300,000,000.

56. Chase made proper written demand on July 29, 1999 to Motorola, requesting Motorola to provide to Chase, as Collateral Agent and Administrative Agent for the Lenders, the Motorola Guarantee of $300,000,000. Motorola wrongfully refused to provide said guarantee.

57. Motorola's refusal to deliver its $300,000,000 guarantee to Chase in response to Chase's demand constitutes a breach of the operative agreements, and entitles Chase to judgment against Motorola in the amount of $300,000,000.