In re CBI HOLDING COMPANY, INC., et al., Debtors.

Bankruptcy Services, Inc., Plaintiff,

v.

Ernst & Young, Ernst & Young, LLP, Defendants.

Bankruptcy No. 94–B–43819(BRL).
Adversary No. 96–9143A.

United States Bankruptcy Court, S.D. New York.

April 5, 2000.

Kaye, Scholar, Fierman, Hays & Handler, LLP, New York City, by Jay G. Strum, Arthur Steinberg, Robert B. Bernstein, for Plaintiff.

Schulte Roth Zabel, LLP, New York City, by Irwin J. Sugarman, Harry S. Davis, Howard O. Godnick, for Defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

BURTON R. LIFLAND, Bankruptcy Judge.

This is an action brought by plaintiff Bankruptcy Services, Inc. ("BSI") as successor to the claims of CBI Holding Company, Inc. ("CBI"), a pharmaceutical wholesale distributor, and its subsidiaries, Commons Bros., Inc. ("Commons Bros."), Granain, Inc. ("Granain"), M. Brenner & Sons, Inc. ("Brenner"), Commons Metro,

Inc. ("Metro"), Granain/Holsin, Inc. ("Holsin") and Commons Bros., Midwest, Inc. ("Midwest") (collectively, the "Debtors" or "CBI") against Ernst & Young and Ernst & Young LLP (collectively "E & Y" or the "Defendants"); as assignee of the Official Unsecured Creditors' Committee's Objection to the Defendants' Proof of Claim Against the Debtors; and as assignee of the claims of Trust Company of the West (with its affiliates "TCW") against Defendants.

E & Y performed audits of, and issued reports with respect to the financial statements of CBI, and its subsidiary Commons Bros. for each of the eleven months ended April 30, 1992 and the fiscal year ended April 30, 1993. BSI alleges that E & Y failed to conduct its audits of CBI for fiscal years 1992 and 1993 in accordance with generally accepted auditing standards ("GAAS"), and that E & Y's conduct caused CBI to file for bankruptcy. It is conceded that in each such year E & Y failed to detect unrecorded liabilities in material amounts. Plaintiff alleges that E & Y's conduct in failing to detect such unrecorded liabilities was reckless, and if not reckless, at least negligent. Plaintiff further alleges that E & Y's conduct was the proximate cause of the damages suffered by CBI and the damages suffered by TCW.

Specifically, the amended complaint asserted seven causes of action

Count I charges E & Y with breach of contract in connection with E & Y's allegedly negligent audits of CBI's 1992 and 1993 financial statements; Count II charges E & Y with negligence in connection with the 1992 and 1993 audits of CBI's financial statements; Count III charges E & Y with negligent misrepresentation and contends that E & Y's report on CBI's 1992 and 1993 financial statements misrepresented the fact that E & Y's audits had been conducted in accordance with Generally Accepted Accounting Standards ("GAAS"); Count IV charges E & Y with "Fraud and/or Recklessness" in connection with E & Y's audits of CBI's 1992 and 1993 financial statements; Count V charges E & Y with "Fraud and/or Recklessness" in connection with E & Y's reaudit of CBI's 1993 financial statement; Count VI charges E & Y with breaching its fiduciary duty to CBI as a consequence of E & Y's alleged failure to make certain disclosures in conducting the audits; and Count VII seeks to set off the damages allegedly caused by E & Y's negligence against E & Y's claim for unpaid fees. Counts I, VI and VII are brought only with respect to claims of CBI. Counts II–V are brought both with respect to claims of CBI and with respect to claims of TCW.

By Memorandum Decision, dated April 21, 1999, this court dismissed BSI's breach of fiduciary duty claim.[1] (*Id.* at 16–17).

---

1. It is important to note that there have been several decisions and orders in this adversary proceeding entered by both this court and the district court dealing with multiple issues including jurisdiction. Almost immediately after the commencement of this adversary proceeding, E & Y filed a motion for an order withdrawing the reference from this court. By opinion and order dated November 13, 1998 (the "1998 Decision"), district court (Wood, D.J.) denied E & Y's motion in its entirety and remanded the case to this court for further proceedings, based on its finding that the amended complaint qualified as a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(C). In December 1998, E & Y moved to reargue (the "Reconsideration Motion"), the 1998 Decision. On March 4, 1999,

while the Reconsideration Motion was pending, E & Y filed a motion in this court to dismiss certain of the claims in the Amended Complaint. With the exception of one claim, the motion to dismiss was denied by this court on April 21, 1999. On May 4, 1999, BSI filed a Notice of Withdrawal of Jury Trial Demand. The following day, E & Y filed its answer (the "Answer"), to the Amended Complaint and demanded a jury trial. By order dated May 20, 1999 (the "Trial Order"), this court provided for the bifurcation of the trial of this adversary proceeding, the date for the filing of a pretrial order and the trial date. Undaunted, E & Y unleashed a new motion (the "Trial Motion") before this court seeking vacatur of the Trial Order on the grounds that

The six remaining causes of action are based on three events: (a) E & Y's audit of CBI's 1992 financial statements; (b) E & Y's audit of CBI's 1993 financial statements; and (c) E & Y's agreement to perform additional procedures.

E & Y denies the material allegations, and asserts several affirmative defenses to be discussed *infra.*

Pursuant to the Trial Order, the issue of liability, but not damages, came on for trial. The trial consumed 17 trial days and produced over 3500 pages of transcript. Plaintiff called 10 witnesses, and Defendants called 9 witnesses. Numerous exhibits were offered and admitted into evidence. Summations consumed an entire trial day. Having considered all of the evidence, testimonial and documentary, as well as the arguments of the parties, and their Proposed Findings of Fact and Conclusions of Law, and keeping in mind that a court should not blindly accept findings of fact and conclusions of law proffered by the parties, *see St. Clare's Hospital and Health Center v. Insurance Company of North America (In re St. Clare's Hospital and Health Center*), 934 F.2d 15 (2d Cir. 1991) (citing *United States v. El Paso Natural Gas Co.,* 376 U.S. 651, 656, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964)), and having conducted an independent analysis of the law and the facts, this Court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

### Background

*The Parties*

1. CBI's principal business was that of a wholesale distributor of pharmaceutical products. The wholesale pharmaceutical distribution business consists primarily of buying pharmaceutical products from manufacturers, and warehousing such products for delivery to various entities, including retail pharmacies, hospitals, and long-term care facilities, which sell the products to end users. (Wiggins Report at 5, DX–879). Wholesale distributors purchase goods and store them in close proximity to their clients to facilitate rapid delivery of drugs to customers, and ultimately to patients. (Wiggins Report at 5, DX–879).

2. Trust Company of The West ("TCW") is a diversified money management firm. (Pados, Tr. at 1185). In May 1991, TCW made a $20 million investment in CBI, receiving in return $15 million of notes and $5 million of shares of CBI common stock. (1991 Securities Purchase Agreement, 5/31/91, PX–103; Pados, Tr. at 1187). This investment was intended to

---

this court lacked the authority to conduct a jury trial and that the bifurcation provision of the Trial Order violated E & Y's right to a jury trial.

While the Reconsideration Motion was *sub judice* before the Judge Wood and after entry of this court's Trial Order, E & Y again moved, by order to show cause, in the district court (Baer, D.J.) for an order withdrawing the reference of this adversary proceeding for the purposes of trial and staying certain related proceedings in this court (the "Jury Trial Withdrawal Motion"). By order dated July 1, 1999, Judge Wood vacated the order to show cause and determined to consider the Jury Trial Withdrawal Motion as part of the Reconsideration Motion. Judge Wood did not stay proceedings in this court.

On August 13, 1999, Judge Wood issued a decision (the "1999 Decision") (i) reaffirming the 1998 Decision and (ii) denying E & Y's motion for reconsideration. In the 1999 Decision, the court reiterated that all the claims asserted by BSI in the Amended Complaint were "core," found that, assuming E & Y had a right to a jury trial, this court was empowered to conduct a jury trial of this adversary proceeding without the consent of the parties and ordered that the action proceed in this court. *See* 1999 Decision at 10–11.

At or about this time, BSI moved this court for an order striking E & Y's jury trial demand. By Memorandum Decision and Order, dated September 3, 1999, this court granted BSI's motion to strike E & Y's jury trial demand and denied E & Y's Trial Motion on the grounds that E & Y had no right to a jury trial. There are no appeals pending.

help CBI achieve its "growth by acquisition" strategy. (Pados, Tr. at 1189–1190).

3. In April 1993, TCW invested an additional $750,000 in CBI, paying $500,000 for notes with a face amount of $750,000, and $250,000 for shares of CBI common stock. (1993 Securities Purchase Agreement, 4/14/93, PX–104).

4. As a result of its initial investment, TCW acquired 48% and Robert Castello held 52% of CBI. (Shareholders Agreement at 2, 5/31/91, PX–111). Mr. Castello became President and Chairman of CBI. TCW also received the right to fill two of the five seats on the CBI Board of Directors and one of the three seats on the Audit Committee of the Board; Mr. Castello had the right to appoint the remainder. (Shareholders Agreement at TCW 000514, 5/31/91, PX–111).

5. E & Y, a limited liability partnership, is one of the country's leading accounting, tax and consulting firms.

6. E & Y became CBI's independent auditors in June 1990. At or about this time, Mr. Castello received an award for "Entrepreneur of the Year" in a promotion sponsored by E & Y and others. (Tr. 118–129; Deposition of Michael Ferrante, pp. 6–11). E & Y performed audits of financial statements for fiscal years 1990 through 1993. These independent audits were performed by auditors from E & Y's office in White Plains, New York. In addition to serving as an independent auditor, E & Y also received fees for performing supplemental mid-year reviews as well as due diligence procedures related to the acquisitions of the stock and/or assets of Granain, Blinn Wholesale Drug Co. ("Blinn"), Brenner, Holsin, and various pharmaceutical wholesalers in the Midwest.

### The Fiscal 1992 Audit

7. E & Y audited the financial statements of each of CBI and its subsidiary Commons Bros. for the eleven months ended April 30, 1992. (PX 23, 31)

8. E & Y issued written reports dated August 6, 1992 with respect to its audits of the consolidated balance sheets of Commons Bros. and CBI, as of April 30, 1992, and the related consolidated statements of income and retained earnings and cash flows for the eleven months then ended. The opinions recite, *inter alia,* that E & Y conducted its audit in accordance with generally accepted auditing standards and that in the opinion of E & Y, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Commons Bros. and CBI at April 30, 1992 and the results of its operations and its cash flows for the eleven months then ended, in conformity with generally accepted accounting principles. (PX 23, 31)

9. The financial statements of Commons Bros. and the financial statements of CBI did not present fairly, in all material respects, the financial position of such companies at April 30, 1992 and the results of their operations and their cash flows for the eleven months then ended in accordance with generally accepted accounting principles.

10. In performing the fiscal 1992 audits of Commons Bros. and CBI, E & Y failed to detect unrecorded liabilities in respect of inventory purchases in the approximate amount of $321,218 at the Granain subsidiary of CBI, and in the approximate amount of $1,494,000 at the Commons Bros. subsidiary of CBI, for a total amount of approximately $1,815,218. (Expert Report of Robert J. Rock, PX 19 ("Rock Report") at p. 31).

11. The unrecorded amount of $1,815,-218 was material in relation to the net income shown in CBI's audited financial statements for the eleven months ended April 30, 1992. (*Id.* at p. 31).

### What E & Y Knew Before Commencing Fiscal 1992 Audit

12. GAAS sets forth the accepted standards of practice for auditors.

13. GAAS requires an auditor to approach an audit with an appropriate degree of professional skepticism.

14. The facts known to E & Y, to be recounted hereinafter, demonstrate that E & Y was required to conduct the fiscal 1992 audit with a high degree of professional skepticism, and it failed to do so.

15. Prior to commencing the fiscal 1992 audit, E & Y prepared a document entitled "Assessment of Control Environment" (PX 3B). That document noted, *inter alia,* the following premonitory observations:

a. management was dominated by the Chief Executive Officer and V.P. Finance.

b. management's attitude towards developing estimates for valuation accounts was aggressive.

c. the limited size of accounting department did not provide for segregation of duties.

d. the company's latest debt agreement included more stringent financial covenants which could influence management's philosophy and attitudes towards estimates.

e. there was no internal audit function.

f. E & Y assessed the control environment as "ineffective."

16. In connection with the fiscal 1992 audit, E & Y prepared a document entitled "Audit Client Continuance Form." (PX 78). On the last page thereof, the following potentially negative factors are noted:

a. the Shareholders Agreement provided for Castello to relinquish control under certain conditions, including non-compliance with the ratio of earnings to fixed charges contained in the Shareholders Agreement.

b. Castello's bonus was tied to earnings targets.

c. the placing by the company of "undue" emphasis on earnings was a recognized possibility.

d. the CBI engagement was classified by E & Y as "close monitoring."

17. E & Y's Audit Manual defines a "close monitoring" engagement as one in which the company being audited presents significant risk to E & Y; that is to say there is a significant chance that E & Y will suffer damage to its reputation, monetarily, or both. (PX 145A).

### The 1992 Audit of Accounts Payable

18. Prior to commencing the fiscal 1992 audit, E & Y prepared a document entitled "Audit Approach Plan Update and Approval Form." (PX 3C). The document was approved by Louis Scerra ("Scerra"), E & Y's engagement partner. The accounts payable area was designated as "High risk." (EY 1994).

19. Prior to commencing the fiscal 1992 audit, E & Y prepared a document entitled "Audit Planning Memorandum" (PX 3). In that document, E & Y recites that in connection with auditing accounts payable, it planned to perform a search for unrecorded liabilities, and to request vendor statements and reconciliations for CBI's 10 largest vendors.

20. Prior to commencing the fiscal 1992 audit, E & Y prepared a document entitled "Audit Program." (PX 3A). The document states, *inter alia,* E & Y's intention with respect to auditing accounts payable:

a. to perform a search for unrecorded liabilities at April 30, 1992 through the end of field work; and

b. to obtain copies of April 30, 1992 vendor statements for CBI's 5 largest vendors and examine reconciliations to the accounts payable balances for such vendors as shown on the books of CBI.

### The 1992 Search For Unrecorded Liabilities

21. A search for unrecorded liabilities (the "Search") is performed by reviewing records of all payments made by the company for a period of time after year end, and for each disbursement over a specified amount, examining the corresponding documentation. (Rock Report, PX 19 at pp.

8–9; Expert Report of Gerald Ward, DX 515 at p. 18).

22. The reason for performing the Search is to determine whether or not the goods or services paid for were received as of the end of the fiscal year under audit. If the goods or services were received prior to year end, the auditor is required to ascertain whether the liability was properly recorded as of the balance sheet date. (*ibid.*)

23. During the audit in respect of fiscal 1992, E & Y found approximately $292,000 of unrecorded liabilities. (Rock Report, PX 19 at p. 15; Expert Report of Gerald Ward. DX 515 at p. 19).

24. However, E & Y failed to detect an additional approximate $1.8 million of unrecorded liabilities in respect of fiscal 1992. (Rock Report, PX 19 at p. 31).

25. CBI made payments in respect of these unrecorded liabilities during the period after April 30, 1992.

26. The payments in respect of these unrecorded liabilities were deceptively labeled by CBI on its check register and in check requisition forms sometimes referred to as "blue slips," as an "advance."

27. In performing the Search in respect of fiscal 1992, E & Y reviewed CBI's checks, check register and blue slips, and observed the "advance" notation thereon. Therefore, the payments made in respect of unrecorded liabilities which E & Y failed to detect were observed by, and therefore known to E & Y, during the course of the 1992 audit.

28. During the fiscal 1992 audit, an E & Y auditor sought an explanation of "advance" and recorded the following in E & Y's work papers:

When CBI is at its credit limit with a large vendor, the vendor may hold an order until they receive an "advance." CBI then applies the advance to the existing A/P balance. (In effect, an advance is just a payment on account to reduce the balance). (PX 4A).

29. At the time E & Y was conducting the Search in respect of fiscal 1992, the accounts payable balance for any particular vendor could have related to merchandise received both in fiscal 1992 and fiscal 1993.

30. Despite the "high risk" designation for accounts payable, when the E & Y auditor observed a payment labeled as an advance the auditor never tested the explanation by checking:

a. if the vendor had a credit limit for CBI.

b. the amount of any such credit limit.

c. the then account payable balance in respect of such vendor.

d. if CBI had received merchandise contemporaneously, in the amount of such advance.

e. to which invoices CBI or the vendor applied such payment.

f. with the vendor, any of the facts supposedly included in the explanation CBI gave E & Y.

31. The "advance" explanation recorded in E & Y's work papers, even if it were true, did not tell the E & Y auditor the essential fact as to whether the merchandise being paid for by the advance had been received before or after April 30, 1992.

32. Similarly, the internal CBI documents looked at by E & Y in respect of advances, consisting of the check register, blue slips and checks, did not tell the E & Y auditor whether the merchandise being paid for by the advance had been received before or after April 30, 1992.

33. With respect to the payments labeled as "advances" observed by E & Y during the Search conducted during the fiscal 1992 audit, E & Y never determined when the merchandise being paid for was received. Therefore, E & Y never determined whether a liability should have been recorded for each such payment as of fiscal year-end, and whether in fact a liability

was recorded for such payment as of fiscal year-end.

34. As a consequence, E & Y failed to complete the Search contemplated by the Audit Program for the fiscal 1992 audit.

35. If E & Y had completed the Search for the payments deceptively labeled "advances," it would have discovered the unrecorded liabilities in respect of fiscal 1992.

### 1992 Vendor Statements And Reconciliations

36. At least one of the purposes of obtaining vendor statements and examining vendor account reconciliations was to test for unrecorded liabilities. (PX 36 at p. EY 1994; PX 42).

37. In conducting the fiscal 1992 audit, E & Y did not obtain vendor statements and did not examine account reconciliations for CBI's five largest vendors as it had planned to do in its Audit Program.

38. E & Y never determined the identities of CBI's five largest vendors for fiscal 1992.

39. Furthermore, E & Y tested only five vendors, out of hundreds. This minimal degree of confirmation with and reconciliation of accounts payable balances was not adequate. (Rock Report, PX 19 at p. 17).

### The Fiscal 1993 Audit

40. E & Y audited the financial statements of each of CBI and its subsidiary Commons Bros. for the year ended April 30, 1993. (PX 24, 34).

41. E & Y issued written reports dated October 26, 1993, with respect to the consolidated balance sheet of Commons Bros. and CBI as of April 30, 1993, and the related consolidated statements of income and retained earnings and cash flows for the year then ended. The opinions recite, *inter alia*, that E & Y conducted its audit in accordance with generally accepted auditing standards and that in the opinion of E & Y, the consolidated financial statements referred to above present fairly, in all material respects, the financial position

of Commons Bros. and CBI at April 30, 1993 and the results of their operations and their cash flows for the year then ended, in conformity with generally accepted accounting principles. (PX 24).

42. The financial statements of Commons Bros. and CBI did not present fairly, in all material respects, the financial position of such companies at April 30, 1993 and the results of its operations and its cash flows for the year then ended, in accordance with generally accepted accounting principles.

43. In performing the fiscal 1993 audits of Commons Bros. and CBI, E & Y failed to detect unrecorded liabilities in respect of inventory purchases in the approximate amount of $1,116,712 at the Granain subsidiary of CBI and in the approximate amount of $6,389,200 at the Commons Bros. subsidiary of CBI, for a total amount of approximately $7,505,912. (Rock Report, PX 19 at p. 31).

44. The amount of $7,505,912 was material in relation to the net income shown in CBI's audited financial statements as of the year ended April 30, 1993. (Rock Report, PX 19 at p. 31).

### What E & Y Knew Before Commencing The Fiscal 1993 Audit

45. The facts known to E & Y concerning CBI, prior to commencing the fiscal 1993 audit did not differ materially from the facts known to E & Y prior to the fiscal 1992 audit.

46. These facts, to be recounted hereinafter, should have once again caused E & Y to approach the audit with a high degree of professional skepticism, and E & Y failed to do so.

47. Prior to commencing the fiscal 1993 audit, E & Y again prepared a document entitled "Assessment of Control Environment." (PX 25). That document again noted, *inter alia*, the following cautionary observations, each of which it had noted by rote prior to the fiscal 1992 audit:

a. management was dominated by the Chief Executive Officer and V.P. Finance.

b. management's attitude towards developing estimates for valuation accounts was aggressive.

c. the limited size of accounting department did not provide for segregation of duties.

d. the company's latest debt agreement included more stringent financial covenants which could influence management's philosophy and attitudes towards estimates

e. there was no internal audit function.

f. E & Y assessed the control environment as "ineffective."

48. The fiscal 1993 audit was again deemed to be a close monitoring engagement. (Tr. p. 1527).

### The 1993 Audit of Accounts Payable

49. Prior to commencing the fiscal 1993 audit, E & Y again prepared a document entitled "Audit Approach Plan Update and Approval Form." (PX 37). The document was approved by Scerra. The accounts payable area was again designated as "High risk." (EY 8879).

50. Prior to commencing the fiscal 1993 audit, E & Y prepared a document entitled "Audit Planning Memorandum." (PX 26A, 26B). In that document E & Y again recited that in connection with auditing accounts payable, it planned to perform a search for unrecorded liabilities and to request vendor statements and reconciliations for CBI's 10 largest vendors.

51. Prior to commencing the fiscal 1993 audit, E & Y prepared a document entitled "Audit Program." (PX 6A). The document stated, *inter alia*, E & Y's intention:

a. to perform a search for unrecorded liabilities at April 30, 1993 through the end of field work; and

b. to obtain copies of April 30, 1993 vendor statements for 10 of CBI's largest vendors and examine reconciliations to the accounts payable

balances of such vendors as shown on the books of CBI.

### The 1993 Search For Unrecorded Liabilities

52. E & Y failed to detect approximately $7.5 million of unrecorded liabilities in respect of fiscal 1993.

53. CBI made payments in respect of these unrecorded liabilities during the period after April 30, 1993. Again, on its check register and on the blue slips, CBI deceptively labeled such payments as an "advance."

54. In performing the Search in respect of fiscal 1993, E & Y again observed such payments in CBI's check register and on the blue slips with the "advance" notation. Therefore, the payments made in respect of unrecorded liabilities which E & Y failed to detect were observed by and therefore known to E & Y during the course of the 1993 audit.

55. The misleading "advance" explanation given to E & Y during the fiscal 1993 audit was the same as the explanation given during the prior year audit—namely that "advances" were not payments for future shipments but rather reductions in the overall accounts payable balance. (Expert Report of Gerald Ward, DX 515 at p. 20).

56. During the fiscal 1993 audit, when E & Y auditors observed such payments labeled as an advance, the auditors looked only at certain CBI generated documents consisting of the check register, the blue slips and the check itself.

57. At the time E & Y was conducting the search for unrecorded liabilities in respect of fiscal 1993 the accounts payable balance for any particular vendor could have related to merchandise received both in fiscal 1993 and fiscal 1994.

58. When the E & Y auditor observed a payment labeled as an advance, again the auditor never tested the explanation by checking:

a. if the vendor had a credit limit for CBI.

b. the amount of any such credit limit.

c. the then account payable balance in respect of such vendor.

d. if CBI received merchandise contemporaneously in the amount of such advance.

e. to which invoices CBI or the vendor applied such payment.

f. with the vendor, any of the facts supposedly included in the explanation CBI gave E & Y.

59. Once again the "advance" explanation, even if it were true, did not tell the gullible E & Y auditor whether the merchandise being paid for by the advance had been received before or after April 30, 1993.

60. The internal CBI documents, consisting of the check register, blue slips and check did not tell the E & Y auditor whether the merchandise being paid for by the advance had been received before or after April 30, 1993.

61. As a consequence, E & Y failed to complete the Search contemplated by the Audit Program for fiscal 1993.

62. If E & Y had completed the Search as contemplated, it would have discovered the unrecorded liabilities in respect of fiscal 1993, the payments for which had been labeled "advances."

63. E & Y's incomplete performance of the Search as it pertained to "advances" is illustrated by its work relating to the "advance" payment of $1,040,000 made to Burroughs–Wellcome on May 13, 1993, less than two weeks after the end of fiscal 1993. Since the ordinary term upon which CBI bought merchandise was "net 30 days" the date of payment alone should have indicated to E & Y that the payment was in respect of merchandise received prior to April 30, 1993. In terms of CBI's business this was a very large payment which should have been closely scrutinized. Moreover, Burroughs–Wellcome was a vendor who received payments on account of unrecorded liabilities which E & Y found during the fiscal 1993 audit, and therefore, this advance transaction should have been more closely scrutinized. (PX 8B).

64. E & Y's failure to properly audit "advances" during the Search is also evidenced by E & Y's review of several blue slips which referenced specific purchase orders. For instance, one blue slip reflecting a $360,000 "advance" to Schering referenced P.O. 18926. (PX 139). The purchase order itself reflected a purchase of only $76,212 of merchandise. (PX 139). Another blue slip reflecting a $120,000 "advance" to Lederle referenced P.O. 19626. (PX 138). The purchase order itself reflected a purchase of only $7,962. (PX 138). Another blue slip reflecting a $100,000 "advance" to Syntex referenced P.O. 19906. (PX 140) The purchase order itself reflected a purchase of only $152.04. (PX 140). E & Y never looked at the referenced purchase orders. If they had, the scheme would have unraveled and the unrecorded liabilities would have been discovered.

65. Prudently, E & Y should have exercised—but did not—a heightened professional skepticism in performing the Search since during the course of performing the Search, E & Y actually found unrecorded liabilities for 15 vendors aggregating approximately $1.4 million. (PX 8B). E & Y recorded in its work papers that according to John O'Brien, the controller of CBI, the subject invoices had not been accrued because they had been held in the purchasing department at year-end. (*ibid.*) E & Y also recorded in its work papers that, at the time it reviewed this explanation, it merely asked the purchasing department if it then held any invoices and was told that it did not. (*ibid.*)

66. E & Y did not ask the purchasing department either if they had held the subject invoices at year-end or if they had held any invoices at year-end.

354

### 1993 Vendor Statements And Reconciliations

67. In conducting the fiscal 1993 audit, E & Y did not follow its own audit program. It did not obtain vendor statements and examine reconciliations for CBI's ten largest vendors or ten of the largest.

68. If E & Y had just performed its audit program as originally proposed, it would have found additional unrecorded liabilities. One of CBI's ten largest vendors was Burroughs–Wellcome. (Testimony of Kevin Mahoney, Tr. p. 2512). If E & Y had obtained a Burroughs–Wellcome statement and examined a reconciliation, it would have seen that the $1,040,000 payment labeled as an "advance" was in fact a payment in respect of an unrecorded liability.

69. E & Y found over $230,000 of unrecorded liabilities in performing a review of vendor reconciliations during the fiscal 1993 audit. As previously noted, E & Y also found the $1.4 million of unrecorded liabilities in performing the Search. E & Y also observed during the Search a large number and amount of advances. Based on these facts and the "integrity" issue discussed *infra*, E & Y should have expanded its procedures in the accounts payable area and sought additional independent verification from third parties (*i.e.*, review of vendor reconciliations). (Rock Report, PX 19 at pp. 20–22).

### Castello's Bonus/Integrity Issue

70. The facts surrounding Castello's bonus in respect of fiscal 1993, and the integrity issues raised thereby, demonstrate anew why E & Y should have exercised an even greater degree of professional skepticism prior to signing its opinions.

71. E & Y's opinions with respect to the Commons Bros. and CBI financial statements for the fiscal year ended April 30, 1993 were signed by Scerra.

72. Prior to the time Scerra signed the opinions on October 26, 1993, Scerra knew that:

a. Castello had taken a portion of his bonus before he was entitled to take it;

b. Castello explained his action to Pados by saying that he had gone four months after fiscal year end without a hint that he would not earn it. (PX 17). Scerra learned of Castello's explanation to TCW before he signed the E & Y opinions. Scerra knew that Castello was not telling the truth because Castello had learned of the $1.4 million of unrecorded liabilities found by E & Y before four months had expired after fiscal year end. Scerra also knew that Castello was not telling the truth in that it was recorded in E & Y's work papers that Castello took his bonus before the end of the fiscal year and had not waited until four months thereafter. (DX 519C). Scerra had therefore concluded that Castello had placed an "undue" emphasis on reported earnings, and that this was a "red flag." (Tr. pp. 866–7).

73. In addition to the integrity concern raised by the Castello bonus for 1993, E & Y knew prior to signing its opinion that CBI management was placing in E & Y's view an "undue" emphasis on earnings in that:

a. when E & Y sought to lower the scope for the Search, Castello's initial reaction was to say no. Castello's response concerned (troubled) Scerra. (Tr. pp. 238–40).

b. Paul Rogers, the chief financial officer, often deflected answering auditor questions, by saying "ask Castello." This was an "integrity" red flag which Scerra eventually noted as Rogers being afraid of his boss, Castello. (Tr. p. 241).

### E & Y's Failure To Comply With GAAS In Each Of Fiscal 1992 And Fiscal 1993

74. GAAS are professional standards established by the American Institute of

Certified Public Accountants which set forth the auditor's professional responsibilities.

75. E & Y did not comply with the professional standards set forth by GAAS in performing its audits of the financial statements of Commons Bros. and CBI, as of and for the eleven months ended April 30, 1992 and as of and for the fiscal year ended April 30, 1993.

76. In each of its fiscal 1992 and 1993 audits, E & Y violated the following provisions of GAAS (DX 514):

a. the second general standard which requires that in all matters relating to the assignment, an independence in mental attitude is to be maintained by the auditor. (GAAS, AU § 220.01).

b. the third general standard which requires due professional care to be exercised in the performance of the audit and the preparation of the report. (GAAS, AU § 230.01).

c. the third standard of field work which requires the auditor to obtain sufficient competent evidential matter through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit. (GAAS, AU § 326).

d. the first, third and fourth standards of reporting, in that the subject financial statements were not presented in accordance with generally accepted accounting principles. (GAAS, AU §§ 410, 431, 504).

77. E & Y improperly seeks to excuse its failure to comply with GAAS by asserting that in each of fiscal 1992 and fiscal 1993 certain members of CBI management intentionally withheld from E & Y the invoices in respect of the unrecorded liabilities.

78. GAAS AU section 316 is entitled "The Auditor's Responsibility To Detect and Report Errors and Irregularities." It defines "irregularities" as intentional mis-statements or omissions of amounts or disclosures in financial statements. (GAAS, AU § 316.03). It provides, *inter alia,* that the auditor should design the audit to provide reasonable assurance of detecting errors and irregularities in the financial statements. (GAAS, AU § 316.05). SAS 19 states that management representations "are not a substitute for the application of those auditing procedures necessary to afford a reasonable basis for his opinion on the financial statements." (GAAS, AU § 333.02).

79. E & Y's Audit Manual instructed its auditors to search for irregularities. (PX 145A).

80. GAAS requires the auditors to conduct the audit with professional skepticism.

81. There is no provision of GAAS that excuses an auditor from performing its obligations where the irregularities are the result of a fraud committed by the client's management.

### E & Y Lacked Independence

82. In performing the audits of CBI and Commons Bros. for fiscal 1992 and for fiscal 1993, and the reaudit procedures commenced in March 1994 as described hereinafter, E & Y lacked the independence and mental attitude required by GAAS Standards AU section 220.

83. Evidence of E & Y's lack of independence was demonstrated by the facts surrounding the departure of Steve Young ("Young"). In early November 1993, CBI hired Young to be Chief Financial Officer.

84. After only eight days on the job, Young left. According to Scerra's notes of a meeting he had with Castello on November 10, 1993 (fifteen days after E & Y issued its opinion with regard to CBI's fiscal 1993 financial statements), Castello said that before he left, Young had alleged $3–4 million of "grey accounting." (PX 1, Exhibit 19 thereto).

85. Castello also stated at the November 10 meeting with Scerra that there was

either a pending or threatened lawsuit between CBI and Young.

86. Scerra never made inquiry of CBI's legal counsel or anyone else concerning such a lawsuit, and never determined if there ever was such a pending or threatened lawsuit.

87. Scerra wanted to speak to Young in order to ask him whether his leaving the post of Chief Financial Officer and his allegations of "grey accounting" had anything to do with the financial statements that E & Y had just certified; however, Scerra obligingly allowed himself to be put off. (Tr. 310).

88. As much as Scerra wanted to speak to Young, as will be discussed *infra*, he was more concerned about insuring E & Y's fees than he was about speaking to Young.

89. Scerra did not speak to Young until March 31, 1994. E & Y already had withdrawn its opinion by that date. In the March 31, 1994 conversation, Young confirmed the existence of $5–6 million of unrecorded liabilities as of April 30, 1993. (PX 1, Exhibit 33).

90. At the time Castello told Scerra that Young was leaving, he also told Scerra that he wanted Paul O'Neill, the E & Y manager on the 1993 audit, off the CBI account. (PX 1, Exhibit 19).

91. Scerra considered this request a "red flag." (PX 13B).

92. Notwithstanding his suspicion, Scerra submissively acquiesced to Castello's request to remove O'Neill from the CBI engagement. (Tr. p. 424), which is yet another example of E & Y's lack of independence.

93. Further evidence that E & Y's independence was compromised is demonstrated by the three special "client continuance meetings" called for by Scerra in December 1993 and January 1994. At each such meeting attended by numerous E & Y partners, they discussed "red flags" with respect to the CBI engagement, including undue influence on earnings, aggressive accounting, Young's allegations and tight bank covenants with frequent violations. (PX 13A, 13B). According to Scerra, who wrote a "red flags" list for these meetings, most of these red flags, including "undue" influence on earnings, were known to E & Y before it signed its opinion with respect to CBI's fiscal 1993 financial statements. (Tr. 866–69).

94. It was Scerra's opinion that continuing the engagement presented too high a risk for E & Y, but apparently he was overruled by his partners. (PX 43). Putting fee concerns over risk, they decided to meet with CBI to share their "integrity" concerns, but only after the outstanding fees were settled. (*ibid.*)

95. Exhibit 21 to PX 1 consists of notes taken by Scerra at a meeting with Castello on February 14, 1994. The notes reflect that the *first* item discussed was E & Y's outstanding bills for approximately $500,000, and the *second* item discussed was future fee. The *last* item was Scerra's desire to speak to Steve Young.

96. Additional evidence that E & Y compromised its independence is demonstrated by events following the first Gorman train ride. In February 1994, Paul O'Neill ran into Ray Gorman, a former controller at the Granain subsidiary ("first train ride"). Gorman made reference to "the things that went on at Granain that we hid from E & Y." O'Neill reported the conversation to Scerra. Scerra did not instruct O'Neill to contact Gorman immediately, nor did Scerra make any attempt to contact Gorman or anyone else at CBI. Instead, Scerra merely instructed O'Neill to ask Gorman what he meant the next time he ran into him on the train.

97. The first Gorman train ride took place before the February 14 meeting referred to above. (Tr. p. 438). In other words, even under the circumstances of the first Gorman train ride, E & Y was prepared to wait to raise the integrity

issue until its outstanding fees were resolved.

98. Further evidence that E & Y's independence had been compromised is demonstrated by facts showing that E & Y solicited and undertook the reaudit assignment after confirming internally that it had failed to conduct a GAAS audit for fiscal 1992 and 1993.

99. On February 16, 1994, O'Neill ran into Gorman again ("second train ride"). At that time, Gorman told O'Neill that there had been unrecorded liabilities at Granain and that the payments with respect thereto had been characterized as "advances." Gorman also told O'Neill that he had mentioned the first train ride conversation to Tom Ortler at Commons Bros., who said "Don't say too much. We could all lose our jobs," thereby indicating that there were unrecorded liabilities at Commons Bros. as well as at Granain.

100. After the second Gorman train ride, but before E & Y auditors began procedures at Granain to determine the veracity of Gorman's allegations, Scerra met with O'Neill, Diana Ferrante and Ron Altomare to review what steps, if any, the E & Y auditors had taken when they had seen payments labeled as "advances" during the Search. They had the work papers in front of them and reviewed what had been done during the Search. (Tr. 1728–34).

101. As a consequence, no later than mid-February 1994 Scerra, O'Neill, Diana Ferrante and Altomare all knew that with respect to the Search:

a. E & Y had looked at certain CBI's internal documents relating only to the payments.

b. E & Y had never determined when the merchandise being paid for by the advances was received (*i.e.*, prior to or after fiscal year-end).

c. E & Y had not properly performed the Search.

d. If E & Y had properly performed the Search, they would have uncovered the unrecorded liabilities.

102. Notwithstanding this knowledge and Ortler's reported conversation with Gorman, E & Y did not commence any procedures at CBI, or discuss the information relating to E & Y's performance during the 1993 audit with anyone at CBI.

103. On March 8, 1994, Alan White, CBI's controller, called Scerra and told him that there were $6–7 million in unrecorded liabilities, and that payments for these liabilities had been labeled as "advances."

104. Between March 8–13, 1994, E & Y identified more than $5 million of unrecorded liabilities that had been labeled as advances and documented them in work papers generated in this March 8–13 period. (DX 522D).

105. On March 9 or 10, Diana Ferrante and O'Neill sat down with Ortler and reviewed approximately 20 "blue slips" and matching invoices with respect to the unrecorded liabilities that had been labeled as "advances." (Tr. 1757–61).

106. This confirmed what E & Y knew by mid-February, namely that E & Y had failed to detect the unrecorded liabilities because they had failed properly to perform the Search.

107. By letter dated March 12, 1994, E & Y stated to CBI's Board of Directors that its reports with respect to the fiscal 1993 financial statements were being withdrawn and could no longer be relied upon. (PX 14).

108. Without revealing that E & Y had failed to detect the unrecorded liabilities because it had failed to properly perform the Search, Scerra solicited the supplemental fee-generating reaudit work while asserting to the TCW representatives on CBI's Board of Directors that E & Y was the best firm to undertake a reaudit of CBI's financial statements.

**358**

109. E & Y's egocentric desire to get the reaudit work is illustrated by the fact that it prepared an audit program for the reaudit two days before E & Y met with the CBI Board of Directors and one day before they withdrew their opinion. (PX 16).

110. In late March 1994, E & Y undertook to perform the reaudit.

111. At no time prior to or during the reaudit procedures did E & Y tell the CBI Board of Directors that, during the Search, E & Y had observed the payments misleadingly labeled as "advances," had done nothing beyond examining a few company generated documents relating to payments, and had not properly performed the Search.

112. The AICPA Code of Professional Ethics Section ET 101.08, states the following:

> "In order for the member to fulfill his obligation to render an informed, objective opinion on the client company's financial statements, the relationship between the management of the client and the member must be characterized by complete candor and full disclosure regarding all aspects of the client's business operations. In addition, there must be an absence of bias on the part of the member so that he or she can exercise professional judgment on the financial reporting decisions made by management. When the present management of a client company commences, or expresses an intention to commence, legal action against the member, the member and the client management may be placed in adversarial positions..." (Rock Report, PX 19, pp. 27–8).

113. E & Y's expert, Mr. Ward, testified at trial that independence would be compromised if there was a reasonable probability of litigation. (Tr. p. 3134).

114. E & Y knew there was a reasonable probability of litigation with CBI prior to the time it undertook the reaudit work.

115. Thus, E & Y knew prior to agreeing to perform the reaudit work that it had not complied with GAAS. E & Y also knew that CBI's Board of Directors did not know of E & Y's failure to comply with GAAS. It is reasonable to infer that if CBI's Board of Directors knew of such failure, E & Y and CBI would be in adversarial positions.

### *Issues of Credibility*

116. In finding that E & Y's fiscal 1992 and 1993 audits failed to comply with E & Y's audit program and failed to comply with GAAS, and that E & Y lacked the requisite independence to undertake the reaudit, I have considered the testimony and reports of plaintiff's expert Robert Rock and defendants' expert Gerald Ward, as well as the trial testimony of present and former E & Y personnel, consisting of Louis Scerra, Paul O'Neill, Diana Ferrante, Ron Altomare and Michael Gertner, as well as the deposition testimony of Michael Ferrante and Rosemary Perugini. I find Mr. Rock to be a highly qualified and experienced accountant and auditor. He testified in a forthright and thoughtful manner and exhibited a thorough knowledge of GAAS. I credit his testimony.

117. Mr. Ward's testimony was of a different sort. Mr. Ward is a principal partner at PricewaterhouseCoopers, LLP, a sibling member of the "big five" accounting firms and an acknowledged expert of audit procedures. On numerous occasions, his answers were not responsive to the question propounded. He could not find the slightest fault with any of E & Y's conduct, in a case where it is clear that in many respects E & Y's conduct failed to comply with applicable standards. On occasion, Mr. Ward testified one way in response to questions from defendants' counsel and to the precise opposite in response to questions from plaintiff's counsel. By way of example, in response to questions from E & Y's counsel, Mr. Ward testified that obtaining vendor statements and examining reconciliations was not an effec-

tive procedure for detecting unrecorded liabilities, while in response to questions from plaintiff's counsel he stated that it was an effective procedure for detecting unrecorded liabilities. (Tr. pp. 2896–2898; 2963–4). Consequently, I have given less weight to Mr. Ward's testimony.

118. I also find that on numerous material issues of fact, the testimony of the present and former E & Y personnel was lacking in credibility.

**Testimony of Scerra**

119. On a number of occasions, I found the testimony of Mr. Scerra to be evasive, lacking in credibility, or both.

120. Scerra's testimony was in direct conflict with O'Neill on the subject of advances. O'Neill stated that he discussed advances observed by E & Y while performing the Search with Scerra during the fiscal 93 audit. Conversely, Scerra denied he was told anything on the subject. (Tr. pp. 241–3, 452–3).

121. Scerra testified that the purpose of obtaining vendor statements and examining reconciliations was not for the purpose of finding unrecorded liabilities, but rather to check for chargebacks and credits. (Tr. p. 1567). Scerra was then confronted with E & Y's 1992 Audit Approach Plan Update and Approval Form (PX3C), a document he signed and approved, which states that the purpose of the step was to search for unrecorded liabilities. (EY 1994). He then testified that such assertion in the document was a "mistake." (Tr. p. 1571–2). This facile testimony lacks credibility.

122. Scerra testified that he met with Steve Young prior to the time Young was hired in November 1993 at the request of Castello or someone else at Commons Bros. He then testified that he did not know why he was asked to speak to Young. (Tr. pp. 296–7). I find that statement to be without credibility.

123. Scerra testified that after he learned that payments in respect of unrecorded liabilities had been labeled as "ad-

vances," he did not recall if he made any attempt to go to the auditors who had observed the advances in order to ascertain what they had done after receiving the explanation and observing the payment. (Tr. pp. 264–5). This testimony is incredible on its face and flatly contradicted by the testimony of Diana Ferrante. She testified that immediately after the second Gorman train ride, when E & Y learned that payments in respect of unrecorded liabilities had been labeled as advances, she met with Scerra, O'Neill and Altomare, and with the work papers in front of them they reviewed what had been done during the fiscal 1993 search for unrecorded liabilities in respect of "advances." (Tr. pp. 1728–34).

124. PX 43 are notes taken by Michael Ferrante at the client continuance meeting of January 4, 1994. Mr. Ferrante recorded that Scerra had observed that the CBI engagement posed too high a risk for E & Y. Scerra denied having made that statement (Tr. p. 348). I find that testimony to be lacking in credibility.

**Testimony by O'Neill**

125. O'Neill was the senior manager on the fiscal 1993 audit. At his 1996 deposition, he testified that during the first train ride with Gorman, Gorman spoke of the things "that we hid from E & Y" during the audits. At trial, O'Neill testified that Gorman did not make such a statement (Tr. pp. 429–32). I find O'Neill's trial testimony on this subject to be without credibility.

126. O'Neill testified that after Gorman informed him during the second train ride that payments in respect of unrecorded liabilities had been labeled as advances, he went back to the work papers and determined that, with respect to advances, the auditors had done no more than record the explanation. He said he spoke to the auditors and determined that they had done no more than that which was reflected in the work papers (Tr. pp. 443–49). O'Neill then testified that he does not recall

whether he reported this information to Scerra (Tr. p. 450). This testimony is without credibility in light of the previously mentioned testimony of Diana Ferrante that O'Neill, Scerra, Diana Ferrante and Altomare met and reviewed the work papers concerning the Search and the observation of advances.

### Ron Altomare

127. Ron Altomare worked on the fiscal 1992 audit at the Staff 2 level and on the fiscal 1993 audit at the Senior 1 level.

128. In numerous instances he had a recollection at trial as to matters as to which he had no recollection at his 1996 deposition. He sought to explain this by saying that prior to trial, he met with counsel for refreshment and looked at documents. But it was also true that he met with counsel for two days of preparation before his 1996 deposition. (Tr. p. 759).

### Facts Bearing On Inapplicability Of Doctrine of Imputation

129. In respect of fiscal 1992 and 1993, certain members of the management of CBI caused liabilities in respect of inventory to remain unrecorded at year-end.

130. TCW, a 48% shareholder of CBI and the TCW representatives on the Board of CBI were not aware of the fraud committed by certain members of CBI management at the times it occurred. If TCW and its representatives had known that the members of CBI management intentionally caused liabilities to go unrecorded, they would have exposed that fact and brought it to the attention of E & Y.

131. A principle reason why such members of CBI management caused liabilities to remain unrecorded at year-end was not for any corporate purpose but rather to ensure that Castello received the maximum possible bonus and remained in control. (DX 1018).

### Facts Establishing That E & Y's Conduct Was The Proximate Cause Of the Damage

132. Pursuant to Section 2(h) of the Shareholders Agreement, (PX 111) TCW had the right to take control of CBI in the event of a "control triggering event." The term "control triggering event" is defined at page 4 of the Shareholders Agreement to include (i) a breach of the earnings to fixed charge ratio contained in Section 7.3 of the Securities and (ii) a failure to pay principal on the $15 million of notes whether such payment was due at maturity or by reason of acceleration.

133. TCW's right to accelerate payment under the notes is set forth in Article 9 of the Securities Purchase Agreement under the heading "Events of Default." Under Section 9(b), TCW had the right to accelerate payment in the event of any failure on the part of CBI to perform or observe in any material respect any covenant or provision required to be performed by it under Article 7 thereof. Article 7 which included the earnings to fixed charge ratio (Section 7.3) also contained a prohibition, in Section 7.2, against certain transactions, including loans to CBI officers, including Castello.

134. A portion of Castello's bonus in respect of fiscal 1992 constituted a prohibited loan because CBI's fiscal 1992 earnings had been overstated. In other words, Castello was overpaid his bonus, and this constituted a prohibited loan.

135. Castello caused a portion of his bonus in respect of fiscal 1993 to be taken prior to the end of the fiscal year in order to make his capital contribution for the purchase of Brenner. E & Y observed this fact during the fiscal 1993 audit. (DX 519C). This also constituted a prohibited loan.

136. From November 1983 to September 1995 Frank Pados was co-head of TCW's private investing effort. He also served as a member of the Board of Directors of CBI.

137. Mr. Pados testified at trial in a candid and forthright manner and I find his testimony to be credible.

138. As stated by Mr. Pados, if TCW had known prior to the issuance of E & Y's report with respect to the fiscal 1992 financial statements that CBI management was deliberately inflating earnings in order to maximize Castello's bonus, TCW would have taken control and either sold CBI or put in additional controls. (Tr. 1202).

139. As stated by Mr. Pados, if TCW had known that Castello caused a bonus to be paid to himself in respect of fiscal 1993 before he was entitled to it and in a larger amount than he was entitled to in order, among other things, to obtain funds to make his equity contribution for the Brenner acquisition, TCW would have taken control and sold the company. (Tr. 1207–8).

140. As stated by Mr. Pados, if TCW had known prior to the issuance of E & Y's report with respect to the fiscal 1993 financial statements that CBI's earnings had been wrongfully inflated by $6–7 million, and that the ratio of earnings to fixed charges had not been achieved, TCW would have taken control and sold the company. (Tr. 1208–9).

141. Pados testified that after E & Y's opinions had been withdrawn, different vendors at different times started to tighten credit terms and reduce shipments. CBI's inventory levels began to shrink and CBI's ability to fill orders declined. CBI's customers had more than one supplier and they began turning to alternative sources of supply. In the words of Mr. Pados, it was like a "run" on the company. (Tr. pp. 1222–24).

142. This conclusion was confirmed by O'Neill's testimony that E & Y knew before it withdrew its opinion that the withdrawal of E & Y's opinion would send a message to the vendors that the financial statements they were relying on could not be relied upon and that extension of credit by the vendors could be significantly impaired. (Tr. 633–4)

143. Also, as Pados testified, after the withdrawal by E & Y of its opinion, the conditions for sale of CBI changed in that the universe of potential buyers decreased because of the desire on the part of most to wait for the results of the reaudit. (Tr. pp. 1387–8).

144. At all relevant times in 1992 and 1993, based on the consolidation which was going on in the industry, CBI could have been sold at a substantial price.

145. On each of October 26, 1993, January 1, 1994, and March 1, 1994, CBI had a value of 18–24% of revenues (Rock Report, PX 19, Expert report of Steven Wiggins, DX 879).

146. In June of 1994, CBI could have been sold for 22% of revenues. (Expert Report of Steven Wiggins, DX 879).

147. In June 1994, FoxMeyer, a company engaged in the wholesale pharmaceutical business, offered to purchase TCW's interest in CBI. (PX 179). FoxMeyer ascribed a $142 million enterprise value to the entire CBI company. (*ibid.*).

148. FoxMeyer requested that E & Y's work papers be provided to its accountants, Deloitte & Touche. Scerra asked Pados to consent to E & Y so providing its work papers, and Pados consented.

149. Thereafter, even though Pados consented to Scerra's request, E & Y declined to provide its work papers to Deloitte & Touche. (PX 99, PX 100).

150. One week thereafter, FoxMeyer communicated to TCW that it was no longer interested in pursuing a transaction. (PX 102).

151. On the other hand, in connection with TCW's 1991 investment in CBI, E & Y let TCW review its work papers for the fiscal year 1991 audit prior to the issuance of its opinion with respect to fiscal year 1991.

152. The demise of CBI was a foreseeable consequence of E & Y's failure to conduct its audits of CBI in fiscal 1992 and 1993 in accordance with GAAS, which was the cause of its failure to detect the unrecorded liabilities, which in turn foreseeably

caused it to withdraw its opinion in March 1994. As direct and reasonably foreseeable consequences thereof, CBI's vendors restricted the amount of credit available, CBI's inventory and sales declined, its revenues declined, its value as a going concern diminished, and ultimately it filed for bankruptcy and was liquidated.

153. As a consequence, E & Y's conduct was the proximate cause of the damage sustained by CBI and TCW.

### Facts Establishing Privity Between TCW And E & Y

154. Prior to TCW making its investment in CBI in May, 1992, TCW representatives met with E & Y and reviewed E & Y's work papers. (Deposition of Brian Mahoney pp. 39–41).

155. In connection with making its investment in CBI, TCW employed E & Y to perform a limited scope businessman's review of Commons Bros. (DX 670).

156. After TCW made its investment, E & Y knew of the Shareholders Agreement and its provisions for a change of control, including non-compliance with the earnings to fixed charge ratio.

157. E & Y also knew of the provision in the Shareholders Agreement which required that CBI's financial statements be audited by an outside accounting firm.

158. As part of its procedures, E & Y in fact reviewed the earnings to fixed charges ratio computation in the Shareholders Agreement and verified compliance therewith for the fiscal 1992 and 1993 audits. (PX 113).

159. E & Y met separately with Brian Mahoney in his capacity as a TCW representative to discuss the computation of the earnings to fixed charges ratio. (Deposition of Brian Mahoney, pp. 45–6).

160. The aforesaid covenants in the Shareholders Agreement constituted one of the reasons for classifying the CBI engagement as "close monitoring." (PX 112).

161. After the second Gorman train ride, E & Y called Brian Mahoney while he was on vacation in Florida. Thereafter E & Y met with TCW at TCW's offices to discuss the allegations. (Transcript of Deposition of Brian Mahoney, pp. 214–15; 226–28).

162. After E & Y withdrew its report in March 1994, E & Y sought and obtained TCW's permission to perform the reaudit.

163. E & Y exhibited an understanding and belief during the reaudit that they were working for TCW. (PX 109).

## CONCLUSIONS OF LAW

### A. Auditor Malpractice

1. In order to state a claim under New York law for auditor malpractice, a plaintiff must establish (1) that there was a departure from accepted standards of practice; and (2) that the departure was a proximate cause of injury. *In re Mid–Atlantic Fund, Inc.*, 39 B.R. 88, 89–90 (S.D.N.Y.1984); *Herbert H. Post & Co. v. Sidney Bitterman, Inc.*, 219 A.D.2d 214, 639 N.Y.S.2d 329 (1st Dep't 1996); *1136 Tenants' Corp. v. Max Rothenberg & Co.*, 36 A.D.2d 804, 319 N.Y.S.2d 1007 (1st Dep't 1971) *aff'd.* 30 N.Y.2d 585, 330 N.Y.S.2d 800, 281 N.E.2d 846 (1972).

2. GAAS sets forth the accepted standards of practice for auditors. *United States v. Arthur Young & Co.*, 465 U.S. 805, 811, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984). An accountant's good faith compliance with generally accepted accounting principles ("GAAP") and GAAS discharges the accountant's professional obligation to act with reasonable care. *Monroe v. Hughes*, 31 F.3d 772, 774 (9th Cir.1994); *Mishkin v. Peat, Marwick, Mitchell & Co.*, 744 F.Supp. 531, 538 (S.D.N.Y.1990) (auditor undertakes duty "to exercise good faith and to observe [GAAS] . . . with the appropriate reasonable, honest judgment that a reasonably skillful and prudent auditor would use under the same or similar circumstances").

3. GAAS AU section 316 provides that an auditor should design the audit to provide reasonable assurance of detecting errors and irregularities in the financial statements. It necessarily follows that once the auditor prepares an audit plan, the failure to carry out the audit as planned, or to adjust the audit procedures based on the results found during the audit, constitute a departure from accepted standards of practice.

4. In each of fiscal 1992 and 1993, E & Y failed to properly conduct the Search.

5. In each of fiscal 1992 and 1993, E & Y planned to obtain certain vendor statements and examine reconciliations with respect thereto. In each of fiscal 1992 and 1993, E & Y failed to carry out this step as planned, and failed to modify the step based on the results observed during the audits.

6. As stated in the Findings of Fact, the fiscal 1992 and 1993 audits conducted by E & Y did not comply with the following GAAS standards:

a. The second general standard which requires that in all matters relating to the assignment an independence in mental attitude is to be maintained (GAAS, AU § 220);

b. The third general standard which requires due professional care to be exercised in the performance of the audit and the preparation of the report (GAAS, AU § 230);

c. The third standard of field work which requires the auditor to obtain sufficient competent evidential matter through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit (GAAS, AU § 326);

d. The first, third and fourth standards of reporting requiring that the subject financial statements be presented in accordance with generally accepted accounting principles (GAAS, AU §§ 410, 431, 500).

7. As a consequence, E & Y's conduct in performing the fiscal 1992 and 1993 audits of Commons Bros. and CBI constituted a departure from accepted standards of practice.

8. The element of causation is essential to liability in the context of BSI's claims including malpractice, breach of contract, negligent misrepresentation and fraud. *Charter Marine Transp. v. Mallory, Jones, Lynch & Assocs., Inc.*, 1990 WL 79863 at *2–3. As the Second Circuit has recently noted,

Causation in this context has two elements: transaction causation and loss causation. *See Schlick v. Penn–Dixie Cement Corp.*, 507 F.2d 374, 380–381 (2d Cir.1974). Loss causation is causation in the traditional "proximate cause" sense—the allegedly unlawful conduct caused the economic harm. *See id.* at 380. Transaction causation means that "the violations in question caused the appellant to engage in the transaction in question." See id. at 380. Transaction causation has been analogized to reliance. *See Currie v. Cayman Resources Corp.*, 835 F.2d 780, 785 (11th Cir.1988).

*AUSA v. Ernst & Young*, 206 F.3d 202, 209 (2nd Cir.2000). Similar to proximate cause, in order to establish loss causation, a plaintiff must prove that the damage suffered was a foreseeable consequence of the misrepresentation. *AUSA v. Ernst & Young*, 206 F.3d at 213. *See also Bernstein v. Crazy Eddie, Inc.*, 702 F.Supp. 962, 986 (E.D.N.Y.1988) (allegations that but for the malpractice, plaintiff would not have suffered injury to its "going-concern value" and "creditworthiness" were sufficient to satisfy proximate cause because such injuries were "reasonably foreseeable consequences" of an accountant's failure to review a company's financial statements properly); *In re Gouiran Holdings, Inc.*, 165 B.R. 104, 106 (E.D.N.Y.1994) (allegations that but for the accountant's malpractice, plaintiff would not have suffered

an increase in debt and embezzlement by its principals was sufficient to establish proximate cause). *Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308, 315, 434 N.Y.S.2d 166, 414 N.E.2d 666 (1980) (plaintiff must show that defendant's negligence was a substantial cause of the events which produced the injury). Where the wrongful act is a failure to perform a duty and performance of the duty would have prevented the harm, causation is established at least where the harm was reasonably foreseeable in the event of a dereliction. *Bernstein v. Crazy Eddie, Inc.*, 702 F.Supp. at 986.

■ 9. As demonstrated in the Findings of Fact, but for E & Y's malpractice, (a) the earnings to fixed charge ratio in TCW's Shareholder Agreement would have been known to have been triggered when the audit was completed in 1993; (b) as a direct and reasonably foreseeable consequence thereof, TCW would have taken control over the company at that time; and (c) as a direct and reasonably foreseeable consequence thereof, the company would have been sold at that time as a going concern for a substantial value. Accordingly, for that reason, E & Y's departure from accepted standards of practice was a proximate cause of injury to CBI and TCW.

■ 10. Alternatively, but for E & Y's malpractice, (a) TCW would have learned in 1992 that Castello was artificially inflating CBI's earnings in order to pay himself a bonus which had not been earned; (b) as a direct and reasonably foreseeable consequence thereof, TCW would have declared a default on its notes and accelerated payment thereunder; as a direct and reasonably foreseeable consequence thereof, TCW would have exercised remedies under its notes and taken control of the company at that time; and as a direct and reasonably foreseeable consequence thereof, CBI would have been sold at that time, *i.e.*, in 1992, as a going concern. Accordingly, for these reasons, E &

Y's departure from accepted standards of practice was a proximate cause of injury to CBI.

■ 11. Alternatively, it was reasonably foreseeable that, as a result of E & Y's malpractice, E & Y would withdraw its audit report on CBI's financial statements in respect of fiscal 1993; that as a direct and reasonably foreseeable consequence thereof, CBI's vendors would thereafter restrict the amount of credit available to CBI; that as a direct and reasonably foreseeable consequence thereof, CBI's sales revenues would decline; that as a direct and reasonably foreseeable consequence thereof, there would be a diminution in the value of CBI as a going concern; and that as a direct and reasonably foreseeable consequence thereof, CBI would file for bankruptcy and be liquidated. Accordingly, for these reasons, E & Y's departure from accepted standards of practice was a proximate cause of injury to CBI.

12. Moreover, there is ample evidence that BSI and TCW relied on E & Y's financial certifications in determining compliance with the control provisions of the Shareholder Agreement.

### B. Application of the Imputation Defense

13. E & Y asserts by way of defense that BSI, as the successor in interest to CBI, lacks standing to assert claims of professional malpractice against E & Y because the knowledge of certain CBI officers and management level employees who were involved in the accounting fraud must as a matter of law be imputed to CBI itself and would therefore bar CBI from contending that it was deceived by the erroneous financial statements that E & Y certified in respect of CBI's 1992 and 1993 fiscal years.

■ 14. However, a corporation whose management was involved in an accounting fraud is not barred from asserting claims for professional malpractice in not detecting the fraud, provided the cor-

poration had at least one decision-maker in management or among its stockholders who was innocent of the fraud and could have stopped it. *Securities Investor Protection Corp. v. BDO Seidman,* 49 F.Supp.2d 644, 649–651 (S.D.N.Y.1999) (permitting malpractice complaint against auditor to stand provided trustee re-pleads to assert the existence of an innocent member of management who could have prevented the fraud); *Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld, LLP,* 212 B.R. 34, 35–36 (S.D.N.Y.1997) (permitting malpractice complaint against law firm to stand despite fraud by company CEO, because imputation rule applies only "where all relevant shareholders and/or decision-makers are involved in the fraud"); *In re Wedtech Securities Litigation,* 138 B.R. 5, 7–9 (S.D.N.Y.1992) (refusing to dismiss malpractice complaint against accountant on imputation grounds where officers guilty of misconduct were not the company's sole shareholders). *Cf. In re Mediators, Inc.,* 105 F.3d 822, 826 (2d Cir.1997) (debtor had no standing to assert claims against third parties because actions of sole shareholder and decision-maker rendered debtor a participant in the fraud).

15. Here, as demonstrated in the Findings of Fact, CBI's 48% shareholder, TCW was innocent of the fraud, and one of its representatives on CBI's board of directors, Frank Pados, testified that had he known of the fraud, he would have taken steps to stop it. It therefore follows that the wrongdoing on the part of CBI's management is not imputable to CBI itself. *Cf. FDIC v. Ernst & Young,* 967 F.2d 166, 171 (5th Cir.1992) (minority board members had no ability to dictate company's activities even if they had been aware audit report was inaccurate).

16. But even if such wrongdoing were to be imputed to CBI itself, CBI would still have standing to assert its claims under the so-called "adverse interest exception." *Securities Investor Protection Corp. v. BDO Seidman, LLP,* 49

F.Supp.2d at 650–651. Under the "adverse interest" exception, the knowledge of company management involved in a fraud will not be imputed to the company itself if such management was acting totally for its own interest and not that of the corporation. *Id.; cf. In re Mediators, Inc.,* 105 F.3d at 827 (adverse interest exception does not apply to cases in which principal is corporation and agent is its sole shareholder).

17. Here, as demonstrated in the Findings of Fact, the evidence showed that the fraud was perpetrated for the purpose of obtaining a bigger bonus for Castello, and to preserve Castello's personal control over the company. For that reason, even if the imputation doctrine were to be initially applicable here, the doctrine would be rendered inapplicable by virtue of the "adverse interest" exception because the segment of management involved in the fraud was acting for its own interest and not that of CBI.

### C. TCW Has Standing To Assert Its Own Claims Against E & Y

18. Generally, for negligence, an accountant is responsible only to his client and those members of a limited class whose reliance on the accountant's service was or at least should have been specifically foreseen. *Mishkin v. Peat, Marwick, Mitchell & Co.,* 744 F.Supp. at 537 (citing *Ultramares Corp. v. Touche,* 255 N.Y. 170, 174 N.E. 441 (1931)); *White v. Guarente,* 43 N.Y.2d 356, 401 N.Y.S.2d 474, 372 N.E.2d 315 (1977). Absent contractual privity, a cause of action for auditor malpractice can be maintained only if the parties' relationship is so close as to approach actual privity. *Prudential Ins. Co. of Am. v. Dewey Ballantine, Bushby, Palmer & Wood,* 80 N.Y.2d 377, 382, 590 N.Y.S.2d 831, 605 N.E.2d 318 (1992).

19. The Court of Appeals in *Credit Alliance Corp. v. Arthur Andersen & Co.,* 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d 110 (1985), set forth the crite-

ria which must be met in order to hold accountants liable in negligence to non-contractual parties who rely to their detriment on inaccurate financial reports. These elements are: "(1) the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or parties' reliance." *Id.* at 551, 493 N.Y.S.2d 435, 483 N.E.2d 110; *see also AUSA v. Ernst & Young,* 202 F.3d at 221. The indicia, while distinct, are interrelated and collectively require the third party claiming harm to demonstrate a relationship with the accountants "sufficiently approaching privity" based on "some conduct on the part of the accountants." *See Security Pacific Bus. Credit, Inc. v. Peat Marwick Main & Co.,* 79 N.Y.2d 695, 702–03, 586 N.Y.S.2d 87, 597 N.E.2d 1080 (1992) (citing *Westpac Banking Corp. v. Deschamps,* 66 N.Y.2d 16, 19, 494 N.Y.S.2d 848, 484 N.E.2d 1351 (1985)). *See also AUSA v. Ernst & Young,* 202 F.3d at 223–24 (investors had standing to sue accountants who were aware that "no-fault" letters were intended to convey information to investors; accountants knew what the letters were for and for whom they were intended); *Bernstein v. Arthur Andersen & Co.,* 210 A.D.2d 193, 621 N.Y.S.2d 80 (2d Dep't 1994) (85% shareholder had standing to sue auditors for malpractice based on Credit Alliance factors); *Chemical Bank v. Brout & Co.,* 172 A.D.2d 382, 568 N.Y.S.2d 761 (1st Dep't 1991) (bank had standing to sue for auditor's malpractice where auditors were aware that borrower's financial reports audited by them would be used for a particular purpose and that bank intended to rely upon them); *John Blair Communications, Inc. v. Reliance Capital Group, L.P.,* 157 A.D.2d 490, 549 N.Y.S.2d 678, 680 (1st Dep't 1990) (party that purchased company based on inaccurate financials had standing to sue auditors where auditors were aware that the financial statements would be used in connection with the sale and that the purchaser intended to rely on them).

■ 20. As demonstrated in the Findings of Fact, each of the *Credit Alliance* factors was satisfied here. Thus, the evidence showed that (1) E & Y was aware that its financial reports were to be used for the particular purpose of, among other things, determining if either Castello or TCW would have the right to control CBI; (2) in furtherance of which TCW was intended to rely; and (3) there was substantial conduct on the part of E & Y linking that firm to TCW, which evinced E & Y's understanding of TCW's reliance, including the facts that (a) E & Y worked with TCW in its investment in CBI, (b) E & Y designated its CBI auditing assignment as "close monitoring" due, in part, to sensitivity over the issue of control, (c) E & Y conducted a review of the earnings to fixed charge ratio which was one of the bases in the Shareholder Agreement upon which control would be determined, (d) E & Y representatives met privately with a TCW board representative (Brian Mahoney) to discuss the CBI audit findings on the issue of control, (e) when allegations of accounting irregularities first surfaced, E & Y representatives met privately with TCW board representatives to discuss them, (f) after the 1993 audit was withdrawn, E & Y made a special pitch to TCW to get approval to do the re-audit, and (g) E & Y representatives admitted in their work papers that its efforts were intended to be "of service" to TCW.

21. However, even if the *Credit Alliance* factors had not been met, TCW would still have standing to assert a claim based on a theory of common law fraud.

■ 22. To recover on a theory of common law fraud, a plaintiff must prove "a misrepresentation or a material omission of fact which was false and known to be false by defendant, made for the pur-

pose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury." *AUSA v. Ernst & Young*, 202 F.3d at 208 *quoting Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.S.2d 413, 421, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (1996). *See also Ross v. Patrusky, Mintz & Semel*, 1997 WL 214957 at * 14 (S.D.N.Y.1997) (allegations that auditor knowingly or recklessly issued a false and misleading opinion on a company's financial statements by failing to disclose that the auditor's examination was not performed in accordance with generally accepted auditing standards was sufficient to state a claim for common law fraud); *Fidelity and Deposit Co. of Maryland v. Arthur Andersen & Co.*, 131 A.D.2d 308, 515 N.Y.S.2d 791 (1st Dep't 1987) (sustaining cause of action for fraud based upon accounting firm's recklessness in failing to independently verify the financial statements of a corporation, which soon after went bankrupt); *Joel v. Weber*, 166 A.D.2d 130, 569 N.Y.S.2d 955 (1st Dep't 1991) (upholding claim of fraud against accounting firm that allegedly overvalued certain assets and undervalued certain liabilities). *See also In re Livent, Inc. Securities Litigation*, 78 F.Supp.2d 194, 217 (S.D.N.Y.1999) (recklessness sufficient to plead scienter may be found where accountants were aware of management's ability to manipulate management information system but failed to take steps to insure such manipulations were not being performed).

23. Under New York law, the scienter required to support a common law claim of fraud against auditors or accountants may be satisfied by a showing of either gross negligence or recklessness. *See State Street Co. v. Ernst*, 278 N.Y. 104, 15 N.E.2d 416 (1938); *see also SEC v. Price Waterhouse*, 797 F.Supp. 1217, 1239 (S.D.N.Y.1992).

24. An auditor may be guilty of gross negligence or recklessness by giving "a representation certified as true as to the knowledge of the accountants when knowledge there is none, a reckless misstatement, or an opinion based on grounds so flimsy as to lead to the conclusion that there was no genuine belief in its truth." *State Street Trust Co. v. Ernst*, 278 N.Y. at 112, 15 N.E.2d 416. As the Court of Appeals explained, "A refusal to see the obvious, a failure to investigate the doubtful, if sufficiently gross, may furnish evidence leading to an inference of fraud so as to impose liability for losses suffered by those who rely on the balance sheet. In other words, heedless and reckless disregard of consequence may take the place of deliberate intention." *Id. See also Ultramares Corp. v. Touche*, 255 N.Y. at 190, 174 N.E. 441 ("negligence or blindness, even when not equivalent to fraud, is none the less evidence to sustain an inference of fraud. At least this is so if the negligence is gross").

25. As demonstrated in the Findings of Fact, one of the excuses given for E & Y's failure to complete the search for unrecorded liabilities in respect of CBI's 1992 and 1993 fiscal years was its blind acceptance of explanations on the part of company management with respect to so-called advances which, even if believed, would not have determined in which fiscal year certain liabilities should have been recorded.

26. E & Y's blind docile acceptance of the explanation given by CBI management for the so-called advances—which were deliberately used to mask unrecorded liabilities—was conduct on the part of E & Y which was reckless and/or grossly negligent. Such reckless and/or gross negligence was demonstrated by clear and convincing evidence. Accordingly, the scienter element required to sustain a claim of fraud was established in this case.

27. Each of the other elements of common law fraud were also established by clear and convincing evidence. E & Y's audit opinion in respect of fiscal 1992 and 1993, which failed to state that its exami-

nation of CBI's financial statements was not in accordance with GAAS, was clearly false and misleading, and TCW justifiably relied to its detriment on such audit opinions by failing to exercise its right to take control over CBI, which it would have a right to do had a proper audit been performed.

## D. Application of the Statute of Limitations Defense

28. E & Y contends that BSI's claims arising from the 1992 audit of CBI's financial statements are time-barred under New York's three-year statute of limitations because the complaint in this matter was not filed until 1996.

29. A cause of action for accountant malpractice ordinarily accrues at the time the work at issue is negligently performed. However, New York will toll the statute of limitations for accountant malpractice under the "continuous representation" doctrine until such time as the accountant stops rendering professional services to the client "in connection with the specific matter directly in dispute." *Ackerman v. Price Waterhouse*, 252 A.D.2d 179, 683 N.Y.S.2d 179, 197 (1st Dep't 1998); *Unadilla Silo Co. Inc. v. E & Y*, 234 A.D.2d 754, 651 N.Y.S.2d 216, 217 (3d Dep't 1996); *Zwecker v. Kulberg*, 209 A.D.2d 514, 618 N.Y.S.2d 840, 841 (2d Dep't 1994); *see also Federal Deposit Ins. Corp. v. Pelletreau & Pelletreau*, 965 F.Supp. 381, 387–88 (E.D.N.Y.1997).

30. As the First Department recently stated, "the continuous representation must be in connection with the specific matter directly in dispute, and not merely the continuation of a general professional relationship." *Ackerman v. Price Waterhouse*, 252 A.D.2d 179, 683 N.Y.S.2d 179, 197. Thus, by way of example, in *Price Waterhouse*, the statute of limitations was tolled based on the accounting firm's "repeated use of an improper accounting method and the repeated failure to disclose

the risks associated with same." *Id.* Similarly, in *Unadilla*, the statute of limitations was tolled based on allegations that the auditor failed to detect—as it should have—embezzlement on the part of its client's chief financial officer. 651 N.Y.S.2d at 218.

31. Here, as shown in the Findings of Fact, E & Y failed to perform a proper search for unrecorded liabilities in respect of the 1992 audit and again failed to perform a proper search for unrecorded liabilities in respect of the 1993 audit. Because the evidence demonstrates that there was a particular form of malpractice that occurred in 1992 and again in 1993, the statute of limitations for the 1992 misconduct is tolled until such time as E & Y stopped rendering services to CBI, which would have been in 1994. Consequently, the statute of limitations for the malpractice that occurred in 1992 is tolled until 1994 and, because the complaint was filed in 1996, the claim in respect of the 1992 audit is within the three-year statute of limitations for such claims and is therefore timely.

## E. Defense Based on GOL § 15–108(c)

32. E & Y contends that BSI is precluded from asserting TCW's claims against E & Y pursuant to N.Y. General Obligations Law § 15–108(c), which states that "[a] tortfeasor who has obtained his own release from liability shall not be entitled to contribution from any other person."

33. Contribution is defined in CPLR § 1401 as a claim that may be made among two or more persons who are "subject to liability for damages for the same personal injury, injury to property or wrongful death."

34. Therefore, in order for TCW's claim to be barred under GOL § 15–108(c), E & Y must show that TCW would have been subject to liability for damages for the same injury to CBI's property that E & Y is alleged to have inflicted, and that

TCW's claim is therefore nothing more than a claim for contribution from E & Y to offset the amount of money it paid to BSI to obtain a release.

35. In fact, there is no evidence that TCW and E & Y were joint tortfeasors and the recovery BSI seeks has nothing to do with any specific sum of money that TCW paid to obtain a release from the Creditors Committee in this case. Indeed, TCW paid no money to obtain that release and the claim BSI is asserting as assignee of TCW's rights is a claim not for contribution, but a claim for the loss TCW incurred of $15 million in notes issued by CBI.

CONCLUSION

For all the foregoing reasons, defendants' motion to dismiss the claims is denied and judgment is granted for the plaintiff on all remaining counts (Count VI having been dismissed previously). The parties shall contact chambers with respect to the resumption of trial on the issue of damages.